**Lonnie MOORE, Appellant,**

v.

**Glenda GAITHER, Appellee.**

**No. 99–SP–277.**

District of Columbia Court of Appeals.

Argued Oct. 17, 2000.

Decided Feb. 22, 2001.

Frank R. Volpe, with whom Mark D. Hopson, Virginia A. Seitz, and Joseph S. Miller were on the brief, Washington, DC, for appellant.

Henry A. Escoto, appointed by the court, filed the brief, Washinton, DC, for appellee.

Mary L. Wilson, Assistant Corporation Counsel, with whom Robert Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia, amicus curiae.

James W. Klein, Public Defender Service, with whom Robert C. Hauhart, Public Defender Service, was on the brief, for the Public Defender Service, amicus curiae.

Before STEADMAN, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

On November 26, 1997, appellee Glenda Gaither was sentenced to serve a term of imprisonment by a judge of the Superior Court. Ms. Gaither was placed at the Correctional Treatment Facility (CTF), a privately operated correctional institution which is located in southeast Washington, D.C. The CTF houses District of Columbia prisoners under the terms of a contract with the District's Department of Corrections (DOC). In January 1998, CTF staff charged Ms. Gaither with several violations of the facility's disciplinary regula-

tions, including bribery, falsification of physical evidence, and "being out of place."

On January 20, 1998, Henry A. Escoto, Esquire, Ms. Gaither's attorney, arrived at the CTF for the purpose of representing his client at a disciplinary hearing on these charges, which was scheduled for that day. Although it had previously been the practice at the CTF to permit attorneys for prisoners to participate in disciplinary proceedings, Mr. Escoto was not granted permission to do so. CTF personnel also denied Mr. Escoto leave to attend the hearing or to consult with his client in advance of the proceedings. Following the hearing, the CTF's Board of Adjustment ordered that Ms. Gaither be placed in "adjustment segregation" (solitary confinement) for several weeks and that she lose certain privileges.

On January 22, 1998, Ms. Gaither petitioned the Superior Court for a writ of habeas corpus. Ms. Gaither alleged that her detention in solitary confinement was unlawful. She claimed that the CTF's refusal to permit her attorney to represent her in the disciplinary proceeding deprived her of rights protected by the Lorton Regulations Approval Act (LRAA), 29 D.C.Reg. 3484 (1982), and the Lorton Regulations, which are codified at 28 DCMR §§ 500 *et seq.* (1987).

On February 5, 1999, more than a year after the petition was filed,[1] the trial judge concluded that under the Lorton Regulations, Ms. Gaither was entitled to legal representation at her disciplinary hearing. The judge ordered

> that all references to the offenses which petitioner was found guilty of at the January 20, 1998, disciplinary hearing and that the time she spent in administrative segregation as a result of said hearing be expunged from her record for failure to comply with 28 DCMR §§ 500 *et seq.*

1. The trial judge initially denied the petition without prejudice, but requested the parties to address the applicability of the Lorton Regu-

lations. Ultimately, the judge granted Ms. Gaither's motion to alter and amend the judgment, and she ruled in Ms. Gaither's favor.

The CTF's Warden, Lonnie Moore, appeals, contending that the LRAA has no application to the CTF and that Ms. Gaither had no constitutional or statutory right to counsel at the disciplinary hearing. The District has participated in the appeal as *amicus curiae* in support of Mr. Moore's position. Ms. Gaither, who is joined in her contentions by the Public Defender Service as *amicus curiae,* asserts that the exclusion of her attorney from the proceeding was in contravention of her statutory and other rights.

Although the denial of counsel to District prisoners at disciplinary hearings is at odds with the practice in this jurisdiction for a quarter of a century, Ms. Gaither's statutory and related arguments do not persuade us that she had a right to such representation while housed at the CTF. Accordingly, we reverse.

## I.

## BACKGROUND

A. *The enactment of the LRAA and the adoption of the Lorton Regulations.*

 The issue before us is one of considerable importance for prisoners confined at the CTF and similar institutions. To put the matter in simple human terms, adjustment segregation in solitary confinement (popularly known as the "hole") is not a pleasant experience, *see, e.g., Hatch v. District of Columbia,* 337 U.S.App. D.C. 266, 268, 184 F.3d 846, 848 (1999) (describing alleged solitary confinement regime at Lorton); *Smith v. Moore,* 749 A.2d 132,

134 n. 3 (D.C.2000) (same), and litigation over prison conditions in this jurisdiction has often been concerned with the protections available to a prisoner in a disciplinary proceeding which may result in his or her placement in solitary. From the perspective of the prisoner, the right to representation by counsel is one of the most important of these protections.[2] Ms. Gaither's quarrel with the CTF is but the latest chapter in a continuing controversy over the operation of prisons and the limits of any role that judges and lawyers should play in determining acceptable conditions of confinement.

For purposes of this appeal, our discussion must begin with a class action brought against the DOC more than a quarter of a century ago by inmates of the Lorton Correctional Complex. *See Wright v. Jackson,* No. 75-0697 (D.D.C.).[3] In that suit, the prisoners alleged that the DOC's disciplinary procedures, including those applicable to the placement of inmates in solitary confinement, denied the plaintiffs rights protected by the Fifth Amendment's Due Process Clause. In 1979, the parties reached a negotiated settlement, and the District agreed to adopt new regulations which were designed, *inter alia,* to protect the procedural rights of prisoners in disciplinary proceedings. These regulations were duly promulgated and adopted, and they are now codified in 28 DCMR §§ 500–519 (1987).

In 1982, in conformity with the settlement of the *Wright* case, the Council of the District of Columbia approved the Lorton

---

**2.** A prisoner does not, however, have a constitutional "right to either retained or appointed counsel in disciplinary hearings." *Baxter v. Palmigiano,* 425 U.S. 308, 315, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Moreover, the Supreme Court has suggested that

[t]he insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the

time and place where hearings are to be held.

*Wolff v. McDonnell,* 418 U.S. 539, 570, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Ms. Gaither's claim in this case is not constitutionally based.

**3.** Lorton is physically located in Virginia, and this class action was initially brought in 1973 in the United States District Court for the Eastern District of Virginia. It was subsequently transferred to the United States District Court for the District of Columbia.

Regulations by enacting the LRAA, which provides, in pertinent part, as follows:

> The Council of the District of Columbia approves the regulations setting forth the administrative procedures for adjustment and housing actions and the code of offenses governing residents of the Lorton Correctional Complex as adopted by the Director of Corrections on February 18, 1981, and published in the D.C. Register on February 27, 1981 (28 DCR 865).

LRAA § 2, 29 D.C.Reg. 3484. The Mayor signed the legislation, and the LRAA was transmitted for Congressional review. 29 D.C.Reg. 3484 (1982). Congress interposed no objection, and the LRAA became law in 1982. This court has held that the Lorton Regulations confer protected liberty interests, and that these interests are judicially enforceable. *See, e.g., Abdullah v. Roach,* 668 A.2d 801, 805–07 (D.C.1995).

B. *The content of the Lorton Regulations.*

The Lorton Regulations articulate the following "General Policy":

> Whenever an offense is charged, the accused shall be accorded all of the procedural safeguards provided in this chapter.

28 DCMR § 500.8. The procedural safeguards to which the "General Policy" refers include an elaborate scheme for legal representation of prisoners at disciplinary hearings. The right to such representation is recognized early in the process. When prison officials conclude that the allegations in a disciplinary report warrant an "adjustment hearing," then "[t]he shift supervisor shall inform the resident that the resident may be represented by counsel." 28 DCMR § 507.6. At least three days before the hearing date, the supervisor

> must inform the resident in writing ... [t]hat the resident may select a representative, including an attorney, or substitute counsel, to represent the resident at the hearing, but that such representation will not be at the expense of the Department of Corrections.

*Id.* § 507.13. In addition, "[i]f the resident desires to be represented by an attorney or substitute counsel but does not have one, the resident shall be given reasonable opportunity to contact any legal service organization approved by the Department of Corrections for that purpose." *Id.* § 507.15. The Regulations ensure that counsel shall have time to prepare for the hearing,[4] and the prisoner's attorney must be permitted to cross-examine adverse witnesses.[5] Finally, "[i]f the resident wishes to appeal, the resident, his counsel, or substitute counsel may listen to the tape or read the minutes." *Id.* § 511.6.

It is undisputed, and, indeed, indisputable, that Ms. Gaither was placed in solitary confinement and subjected to other discipline without having been provided any of the protections described above. Accordingly, if the Lorton Regulations apply to disciplinary proceedings at the CTF, then Ms. Gaither received institutional punishment on the basis of a hearing that was not conducted in conformity with those regulations. To determine whether the CTF was required to follow the Lorton Regulations, we turn to the creation and history of that facility.

C. *The Correctional Treatment Facility.*

We are in an era of privatization, and prisons are no exception. In 1992, the DOC opened a new correctional facility,

---

4. Counsel or substitute counsel for the resident shall be given an opportunity to meet with potential witnesses at least forty-eight (48) hours before the adjustment hearing; Provided, that no potential adverse witness may be compelled to meet with counsel or substitute counsel. 28 DCMR § 510.3.

5. If any accusing officer or other adverse witness is called by the Board and testifies against the resident, the resident's counsel or substitute counsel shall be allowed to cross-examine the officer or witness. 28 DCMR § 510.4.

designated the CTF, on federal land adjacent to the District of Columbia Jail in southeast Washington, D.C. In 1996, in contemplation of the sale and leaseback of the CTF to the Corrections Corporation of America (CCA), a privately owned operator of prisons, the Council of the District of Columbia enacted the Correctional Treatment Facility Act of 1996 (CTFA), D.C.Code §§ 24–495.1 *et seq.* (1999), which created the CTF and established certain legal standards governing the facility. See Part II C, *infra.*

In March 1997, the CCA assumed the operation and management of the CTF in accordance with the terms of a previously approved "Management Agreement" with the DOC.[6] Under the terms of the Management Agreement, the CCA was required to comply with certain "operating policies of DOC which are listed on Exhibit A." Exhibit A to the Management Agreement named the LRAA as one of the policies that the CCA was bound to observe. Indeed, the LRAA was the first policy listed in the Appendix. The Management Agreement, however, also included the following "waiver" provision:

> 5.1.1. ... If the Operator [CCA] concludes that a waiver of or a deviation from a term of this Agreement, the Requirements, the Standards and/or DOC Policies is appropriate, the Operator shall request in writing the District's approval of the waiver or deviation. No such waiver or deviation shall be permitted until approved by the District in writing.

The Management Agreement further made it clear that the agreement confers no rights on anyone other than the contracting parties:

6. The Mayor had submitted the Management Agreement to the Council for its approval in November 1996. 43 D.C.Reg. 6435 (1996). Shortly thereafter, by "Resolution," the Council approved the agreement. Resolution 11–631, § 3, 43 D.C.Reg. 6703, 6704 (1996).

7. Under the CCA's procedures, the staff representative "may provide a broad range of assis-

> 13.6 *Third Party Beneficiary.* Except as specifically provided in this Agreement, the provisions of this Agreement are for the sole benefit of the Parties hereto and shall not be construed as conferring any rights on any other person.

In early 1997, when the CCA assumed the management and operation of the CTF, it sought a waiver of its obligations under the LRAA. Specifically, the CCA requested the DOC's permission to substitute alternate disciplinary procedures, under which, in lieu of counsel, a "staff representative will be appointed when it is apparent that an inmate is not capable of collecting and presenting evidence on their [sic] own behalf." On March 4, 1997, the DOC notified Mr. Moore and other CCA and DOC officials that the "modifications which were requested by CCA have been approved by the Department of Corrections (DOC) General Counsel," and that "CCA may use the [American Correctional Association] standard."[7]

## II.

## LEGAL ANALYSIS

### A. *Mootness.*

■ On January 29, 1999, Ms. Gaither was released on parole. Ms. Gaither was thus no longer incarcerated at the CTF on February 5, 1999, when the trial judge issued her ruling in Ms. Gaither's favor. Having filed a notice of appeal from the judge's order, Mr. Moore now asks us to vacate that order and, in effect, to dismiss his own appeal as moot.

tance to the prisoner," including "question[ing] witnesses for the accused" and "present[ing] documentary evidence." The CCA claims, and the DOC apparently does not dispute, that the CCA's procedures are consistent with the standards promulgated by the American Correctional Association.

Although our decision in this case is not likely to affect Ms. Gaither personally,[8] the question presented by this appeal is capable of repetition but evades review, at least as to prisoners at the CTF, other than Ms. Gaither, who may wish to be represented by counsel at similar disciplinary proceedings. If, following a disciplinary hearing at which a prisoner has been denied counsel, that prisoner is committed to solitary confinement for a comparatively brief period of time, it is most unlikely that he or she will be able to obtain a dispositive appellate resolution in time to provide him or her with effective relief. Accordingly, in the exercise. of our discretion, *see Adams v. Braxton,* 656 A.2d 729, 731 n. 4 (D.C.1995), and on the authority of *Tyler v. United States,* 705 A.2d 270, 273 (D.C. 1997) (en banc), *Smith v. Moore,* 749 A.2d at 135 n. 4, and *Teachey v. Carver,* 736 A.2d 998, 1003 (D.C.1999), we decline Mr. Moore's request to dismiss the case on mootness grounds. Instead, we proceed to the merits.[9]

## B. *The LRAA.*

■ Ms. Gaither contends that the Lorton Regulations confer upon her a right to counsel at disciplinary proceedings conducted at the CTF. We are unable to agree with this contention. .

We begin, as we must, with the language used by the legislature. The wording of the LRAA discloses that the Act has no application to the CTF. The title of the statute—the Lorton Regulations Approval Act—tells us that the legislation concerns procedures at Lorton. Moreover, as we have previously noted, § 2 of the LRAA is quite specific. The statute "approves the regulations setting forth the administrative procedures for adjustment and housing actions and the code of offenses *governing residents of the Lorton Correctional Complex.*" LRAA § 2, 29 D.C.Reg. 3484 (1982) (emphasis added).

The legislative history confirms that the LRAA and the underlying regulations were designed to apply to Lorton only:

> The purpose of Bill 4–351 is to satisfy one of the conditions of a 1979 settlement agreement in the case of *Nathaniel B. Wright, III et[ ] al. v. Delbert C. Jackson, et al.,* (U.S. District Court, Civil Action No. 75–0697). That case is a prisoners' class action suit which seeks determination of what process is due *the approximately 2,000 inmates at Lorton Reformatory* before they may be subjected to "grievous loss" in the form of good time credits or confinement in more restrictive housing facilities. The District of Columbia Department of Corrections as defendant has agreed to now seek Council approval of regulations which were approved by all parties in the case and which set forth the code of offenses *governing residents of the Lorton Correctional Complex,* the disciplinary policy and procedures (adjustments) applicable to violations of the code of offenses, and inmate housing policies.

8. Counsel for the Public Defender Service has advised us, however, that Ms. Gaither's parole has been revoked and that she is once again incarcerated, this time at the Federal Correctional Institution at Danbury, Connecticut. The continued presence in Ms. Gaither's record of the disciplinary action challenged in this appeal might, however, affect disciplinary decisions at her present place of confinement, as well as determinations regarding her possible future eligibility for release on parole. *But cf. Smith v. United States,* 454 A.2d 1354 (D.C.1983) (dismissing as moot appeal from revocation of probation where defendant had completed serving her sentence for underlying offense).

9. We recognize that both in *Tyler* and *Teachey,* it was the appellee, *i.e.,* the party that prevailed in the trial court, that sought dismissal of the appeal as moot. In the present case, the party asserting the claim of mootness *lost* in the trial court and filed his notice of appeal at a time when the issue was already arguably moot as to Ms. Gaither herself. In our view, however, the identity of the movant does not preclude us from declining to dismiss the appeal as moot. *Cf. Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen,* 815 F.2d 1435, 1444–53 (11th Cir.1987).

Enactment of Bill 4–351 would effect Council approval of these regulations in conformity with the D.C.Code, and thereby finally terminate litigation pending since 1975.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, *Report on Bill 4–351*, THE LORTON REGULATIONS ACT OF 1982, at 1 (June 9, 1982) (emphasis added).[10]

A careful examination of the Lorton Regulations discloses that they were not, and could not have been, intended to apply at privately operated facilities such as the CTF. The regulations specify that a number of critical roles in the disciplinary process are to be performed by DOC officials. They provide, for example, that the Adjustment Board, which is responsible for determining a prisoner's guilt or innocence of disciplinary infractions, "shall consist of three (3)[11] Department of Corrections Officials." 28 DCMR § 509.1. The Housing Board, which determines whether a prisoner is to be placed in administrative segregation for reasons of safety or security, is likewise "composed of three (3) officials of the Department of Corrections." *Id.* at 522.1. But the DOC has no day-to-day involvement in the operation of the CTF or of other prison facilities operated by the CCA. Indeed two CCA prisons are located in Ohio and New Mexico respectively. At private correctional institutions, there are no DOC officials available on the scene to carry out the functions assigned to DOC personnel by the Lorton Regulations. It follows that these provisions were not crafted with private facilities in mind, and it would be unreasonable to apply the Lorton Regulations to institutions such as the CTF, at which they cannot be implemented as written.

In ruling in Ms. Gaither's favor, the trial judge relied on 28 DCMR § 500.1, which provides that the Lorton Regulations "shall govern disciplinary action taken when a resident of a *District correctional facility* is charged with a violation of the Code of Offenses. . . ." (Emphasis added.) But even if one were to assume that the term "District correctional facility" is broader than "Lorton Correctional Complex," and that it could be construed as including the CTF, a regulation may properly govern only those matters that the statute authorizes it to govern; statutory coverage thus necessarily limits, and trumps, any purported broader coverage in the regulation. Moreover, the phrase "District correctional facility" is anything but clear, and does not necessarily include the CTF.[12] Given the language and legisla-

10. There are other contemporary indications that the intent of the Lorton Regulations was to address problems at Lorton, but not at other DOC correctional facilities such as the D.C. Jail or halfway houses. In a letter dated November 6, 1981, in which he submitted the regulations to the Council for its approval, Mayor Marion Barry described them as "governing *residents of the Lorton Correctional Complex.*" (Emphasis added.) On June 3, 1982, an attorney for the plaintiffs in the *Wright* case urged the council to approve "Bill No. 4–315(sic), which deals with the adjustment and housing procedures to be followed at *Lorton Reformatory* and by the District of Columbia Department of Corrections." (Emphasis added.)

11. In this instance, as in others, we are mystified as to why both the word "three" and the parenthesized numeral are included in the text of the provision.

12. We find persuasive the following discussion in Mr. Moore's brief:

For example, it is common ground—or should be—that the one facility to which the Lorton regulations were undoubtedly intended to apply is Lorton itself. However, if one were to interpret the term "a District correctional facility" in 28 DCMR § 500.1 to mean "a correctional facility physically located in the District" (as the Superior Court appears to have done), the regulations would *not* apply to Lorton, which is physically located in Virginia. This result is absurd. If, instead, one were to interpret the term "a District correctional facility" to mean "a correctional facility, wherever located, that houses D.C. inmates," the regulations would apply to each and every federal and state facility in which D.C. inmates have been (or may come to be) housed during the time they are housed there. This result, too, is absurd. Under Article IV(e) of D.C.'s Interstate Corrections Com-

tive history of the LRAA, as well as the provision in the Lorton Regulations for the performance of important functions by DOC officials, we do not believe that the vague terminology in § 500.1 warrants the conclusion that the Lorton Regulations apply at the CTF.[13]

■ At the time the LRAA was enacted, District prisoners were not housed at the CTF or at similar institutions. It may be that if they had been so placed, the DOC would have promulgated, and the Council would have approved, regulations assuring for these prisoners the right to representation by counsel at disciplinary proceedings. Since DOC personnel are not available to serve on Adjustment Boards or Housing Boards at private prisons, the regulations might have provided for alternate staffing of these bodies. No such measures having been promulgated or approved, however, we may not expand by judicial "construction" regulations which were designed solely for facilities operated by the DOC, and which cannot be applied, according to their terms, at privately run prisons. "It is not within the judicial function ... to rewrite the statute [or regulation], or to supply omissions in it, in order to make it 'more fair.'" *1841 Columbia Rd. Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 575 A.2d 306, 308 (D.C.1990). In the words of Justice Brandeis, writing for a unanimous Supreme Court, what Ms. Gaither asks

> is not a construction of a statute,[14] but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included

within its scope. To supply omissions transcends the judicial function.

*Iselin v. United States*, 270 U.S. 245, 250–51, 46 S.Ct. 248, 70 L.Ed. 566 (1926); *see also Chase v. District of Columbia Alcoholic Beverage Control Bd.*, 669 A.2d 1264, 1268–69 (D.C.1995) (quoting *Iselin* ).

## C. The Correctional Treatment Facility Act.

■ Writing as a friend of the court on behalf of Ms. Gaither, the Public Defender Service contends that the Correctional Treatment Facility Act requires the CCA to permit counsel to represent Ms. Gaither and other prisoners at disciplinary hearings at the CTF. Mr. Moore asserts that this claim was not presented on Ms. Gaither's behalf in the trial court, and the appellate record appears to bear him out. In any event, we do not believe that the CTFA is fairly susceptible of the construction which the Public Defender Service urges us to adopt.

Section 4 of the CTFA reads as follows:

> An inmate confined in the CTF shall be deemed to be at all times in the legal custody of the Department of Corrections. Only the Department of Corrections shall have authority to transfer or assign inmates into or out of the CTF. *All laws and regulations governing conduct of inmates, including, without limitation, Title 22 of the District of Columbia Code, shall apply to inmates confined to the CTF during such time as the CTF is operated by a private operator.* All laws and regulations es-

---

pact ("ICC"), inmates who are transferred to another state's facility "shall be treated equally with similar inmates of the receiving state confined in the same institution." D.C.Code § 24–1001. The courts have uniformly construed analogous ICC provisions to mean that an inmate is subject to the disciplinary hearing procedures of the *receiving, not* the sending, state. (Emphasis in original; citations omitted.)

**13.** According to the Public Defender Service, "[i]t is sufficient for this case to construe

'District correctional facility' to include any correctional facility, other than the Jail and halfway houses, under the authority of DOC pursuant to D.C.Code § 24–442, a definition that encompasses CTF." We are at a loss to understand how, read literally, § 500.1 could rationally be construed as including the CTF when, as the Public Defender Service admits, the term does not include the D.C. Jail.

**14.** Or, here, of the Lorton Regulations.

tablishing penalties for offenses committed against correctional officers or other correctional employees, including without limitation, the penalties provided for in § 22–505, shall apply mutatis mutandis to offenses committed against any private correctional officer or other employees of the private operator.

D.C.Code § 24–495.3(a) (1999) (emphasis added). Referring to the Lorton Regulations and their requirement that prisoners be permitted to have legal representation at disciplinary hearings, the Public Defender Service insists that "[i]t is hard to imagine any legal ruling in the District of Columbia that fits better the definition of 'laws and regulations governing the conduct of inmates.'" In our view, this proposed construction stretches the statutory language beyond the breaking point.

Section 4 ˙of the CTFA, as we have seen, renders applicable to prisoners at the CTF "all laws and regulations governing *the conduct* of inmates." The statute says nothing at all regarding *protections* available to inmates. A requirement that prisoners be permitted to have representation by counsel at disciplinary hearings does not govern their conduct. On the contrary, where such a requirement exists, it restricts the conduct of correctional officials.

Section 24–495.3(a) also states that laws and regulations governing conduct of inmates "includ[e], without limitation, Title 22 of the District of Columbia Code." Title 22 contains the criminal laws generally applicable in the District. The statute thus says that inmates incarcerated in the CTF, a privately operated prison, remain subject to prosecution under the District's criminal laws. Section 24–495.3(a) goes on to provide that penalties for offenses committed against DOC personnel shall apply to offenses against personnel employed at the CTF. The entire thrust of the provision is to ensure that District of Columbia authorities are able to deal appropriately with any unlawful or criminal conduct on the part of prisoners at the CTF.

The conclusion that § 24–495.3(a) was designed to clarify the District's continued control over prisoners at the CTF, and that it did not create new inmate rights, is bolstered by a comparison of that provision with § 24–495.3(b). Subsection (b) specifies that prisoners confined in privately operated facilities contracted for by the federal government are under the control of the federal Bureau of Prisons and subject to federal law.[15] We agree with the District that the "intent of the two sections is not to create rights for prisoners that prisoners do not otherwise have (like an entitlement to procedures set out in the Lorton [R]egulations), but to clarify that the District of Columbia and the federal government maintain ultimate control over D.C. prisoners in their respective contract prison facilities."

Moreover, as we have explained, see pp. 283–285, *supra*, the Lorton Regulations cannot by their terms apply to the CTF, for the DOC personnel charged with serving on bodies such as the Adjustment Board and the Housing Board are simply not available. In Part II B of this opinion, we have held, in accordance with the language and legislative history of the LRAA,

15. D.C.Code § 24–495.3(b) provides:

An inmate confined in any privately-operated prison facility established pursuant to Subtitle C of the National Capital Revitalization and Self–Government Improvement Act of 1997, approved August 5, 1997 (P.L. 105–33; 111 Stat. 712), shall be deemed to be at all times in the legal custody of the Federal Bureau of Prisons. Only the Federal Bureau of Prisons shall have authority to transfer or assign inmates into or out of the privately-operated prison facility. All laws and regula-
tions governing conduct of inmates in Federal Bureau of Prisons facilities shall apply to inmates confined in any privately-operated prison facility during such time as the prison facility is operated by a private operator. All laws and regulations establishing penalties for offenses committed against correctional officers or other correctional employees shall apply wherever applicable to offenses committed against any private correctional officer or other employee of the private operator.

that the Lorton Regulations were designed to apply only to the Lorton complex. We question, but need not decide, whether the statutory reference to "[a]ll laws and regulations governing conduct of inmates" may fairly be read to include procedures applicable to some but not all of the District's correctional facilities. But even assuming, *arguendo,* that § 24–495.3(a) could be construed as rendering applicable to the CTF some regulations previously applicable only at Lorton, Ms. Gaither's position still fails. The CTFA, as we have noted, refers to "laws and regulations governing the *conduct* of inmates." D.C.Code § 24–495.3(a). The Lorton Regulations contain a "Code of Offenses" which does, in fact, govern the conduct of prisoners at Lorton. *See* 28 DCMR §§ 501–04. But, as Mr. Moore points out in his reply brief, the remaining regulations, including those that provide prisoners at Lorton with the right to counsel at disciplinary proceedings, "govern the conduct *not* of inmates, but of those who manage the prison." (Emphasis in original.)

For the foregoing reasons, we conclude that the denial of counsel to Ms. Gaither at the disciplinary hearing did not violate the CTFA.

### D. *The Management Agreement.*

█ Finally, Ms. Gaither and the Public Defender Service argue that even if neither the LRAA nor the CTFA required the CCA to permit Ms. Gaither to be represented by counsel at the disciplinary hearing, she had the right to be so represented under the Management Agreement executed by the DOC and the CCA. The reader will recall that the LRAA was listed in an appendix to the Management Agreement as one of the policies that the CCA was required to follow. The Agreement, as we have noted, was approved by a Resolution of the Council of the District of Columbia. Although the CCA secured a written waiver from the DOC of its contractual obligation to adhere to the LRAA, the Public Defender Service contends that

the DOC lacked authority to waive this requirement:

> The fatal flaw in CCA's reliance on the waiver provision is that the waiver cannot mean what CCA wants it to mean without running afoul of D.C.Code § 24–442. The waiver provision cannot allow a combination of CCA and DOC officials to promulgate disciplinary regulations for a District correctional facility that Congress has decided must be promulgated through public lawmaking including legislative review.

The issue raised is an interesting one, but we need not and do not reach it. If, as we have held, Ms. Gaither had no statutory right, either under the LRAA or under the CTFA, to be represented by counsel at her disciplinary hearing, the contract between the DOC and the CCA did not create one. This conclusion is compelled both by the general law of government contracts and, especially, by the express terms of the Management Agreement.

█ The courts have recognized "the basic contract principle that third party beneficiaries of a Government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract absent clear intent to the contrary." *Beckett v. Air Line Pilots Ass'n,* 301 U.S.App. D.C. 380, 388, 995 F.2d 280, 288 (1993) (emphasis in original) (citing RE-STATEMENT (SECOND) OF CONTRACTS § 313(2) & cmt. a (1981)). "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." *Hook v. Ariz. Dep't of Corrections,* 972 F.2d 1012, 1015 (9th Cir.1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS *supra,* § 313(2) cmt. a.).

In the present case, there was neither a "clear" nor a "manifest" intent contrary to the general rule articulated in these authorities. *Beckett, supra,* 301 U.S.App. D.C. at 388, 995 F.2d at 288; *Hook, supra,* 972 F.2d at 1015. On the contrary, the Management Agreement unambiguously

states that, except as otherwise specified, its provisions "are for the sole benefit of the Parties hereto and *shall not be construed as conferring any rights on any other person.*" (Emphasis added.) Ms. Gaither cannot reasonably claim the right she now seeks to assert in light of this explicit and, in our view, dispositive provision.

It is true, as the Public Defender Service points out, that the DOC has authority to promulgate rules and regulations for correctional institutions "with the approval of the Council of the District of Columbia." D.C.Code § 24–442 (1999). It is also true that the Council duly passed a Resolution approving the Management Agreement, which required the CCA, at the time of the Council's action, to adhere to the policies of the LRAA. But the Agreement which the Council approved also contained § 13.6, which states that the Agreement creates no rights in any person other than the contracting parties. We lack the authority to rewrite the contract between the CCA and the DOC, and we must construe it in accordance with its terms. If the Management Agreement is so read, it provides no solace for Ms. Gaither's position.

## III.

## CONCLUSION

The judgment of the trial court is reversed, and the case is remanded for proceedings consistent with this opinion.

*So ordered.*