**FORT LINCOLN CIVIC ASSOCIATION, INC., et al., Appellants,**

v.

**FORT LINCOLN NEW TOWN CORPORATION, et al., Appellees.**

**No. 05–CV–1410.**

District of Columbia Court of Appeals.

Argued Jan. 24, 2007.
Decided March 20, 2008.

---

Bruce J. Terris, Washington, DC, with whom Lara A. Cartwright–Smith, was on the brief, for appellants.

Frederick D. Cooke Jr., Washington, DC, for appellees Fort Lincoln New Town Corporation, Inc., Fort Lincoln Realty Corporation, Inc., and Michele V. Hagans.

Ashley E. Wiggins, Washington, DC, for Barbara A. Jones, with whom Mark G. Griffin, was on the joint brief, for appellees.

Before REID and THOMPSON, Associate Judges, and STEADMAN, Senior Judge.

REID, Associate Judge:

Appellants, Fort Lincoln Civic Association, Inc. ("the Civic Association") and Nora Faison, Lillie Mae Griffin, Carol Hood–Mainor, and Harry D. Morgan (collectively "appellants"), appeal the trial court's dismissal of their breach of contract and non-breach of contract claims against appellees, Fort Lincoln New Town Corporation, Inc. ("New Town"), Fort Lincoln Realty Corp., Inc. ("the Realty Corp."), Michele V. Hagans, and Barbara A. Jones (collectively "appellees"). The trial court dismissed appellants' breach of contract claims against appellees after concluding that appellants were incidental beneficiaries of a contract entered into by a District of Columbia government agency, then known as the Redevelopment Land Agency ("the RLA") and New Town. Subsequently, the trial court dismissed appellants' remaining claims after granting ap-

pellees' motion for summary judgment. The trial court concluded that the appellants' non-contract claims were not separate and distinct claims from their breach of contract claim, and that appellants did not provide sufficient evidence to establish that any specific duties were owed to them by appellees.

We hold that the trial court properly dismissed the appellants' breach of contract claims because the Civic Association and its members are only incidental beneficiaries of the Land Disposition Agreement ("LDA"). We also conclude that the trial court properly granted summary judgment in favor of appellees on appellants' tort and equitable claims. Thus, we affirm the judgment of the trial court with respect to all of these claims. However, we conclude that summary judgment in favor of appellees on appellants' statutory claims was improper, and hence, we remand the statutory claims to the trial court for further proceedings.

## FACTUAL SUMMARY

The record reveals that on June 13, 1975, Fort Lincoln New Town Corporation ("New Town"), the "Redeveloper," and an agency of the District of Columbia, then known as the Redevelopment Land Agency ("the RLA"),[1] entered into a contract, the Land Disposition Agreement ("the LDA" or "the Agreement"). Under the LDA, the RLA "agree[d] to sell and/or to lease as lessor, and the Redeveloper [ ] agree[d] to purchase and or to lease as lessee," certain "Private Development Property,"[2] located in the "Fort Lincoln Urban Renewal Area," in the Northeast

---

**1.** *See* D.C.Code §§ 5–803 and –804 (1981), recodified at D.C.Code §§ 6–301.03 and 6–301.04 (2001). The RLA no longer exists. Its functions, duties, powers, and assets were transferred to the RLA Revitalization Corporation under D.C.Code §§ 2–1219.31, *et seq.* (2007).

**2.** Article I of the Agreement defined the "Private Development Property" as "Town Center Parcels of approximately 30 acres, three Community Mall parcels of approximately one acre each, and approximately 143 acres of Residential Parcels ...., all to be developed by the Redeveloper." The Private Develop-

quadrant of the District of Columbia. The Urban Renewal Plan for the Fort Lincoln Urban Renewal Area ("the Urban Renewal Plan") called for "the creation of an attractive and racially, socially, economically, and functionally inclusive community of approximately 16,000 persons."[3] The stated "general development objectives" focused on a "multifunctional Town Center"; community facilities; secondary and higher education institutions; public parks and recreational facilities; and housing, including "construction of approximately 4,600 Dwelling Units with a wide variety of housing types, densities and bedroom sizes for Low Income, Moderate Income, and Middle Income families and individuals, including the elderly."[4] The LDA, § 1(j), defined "Dwelling Unit" as "one or more habitable rooms forming a single household unit with kitchen and bathroom facilities exclusively for the use of, and under the control of, the occupants thereof."

Article III, § 3.1 of the LDA contained restrictions on the use of the Private Development Property. Section 3.2 set forth various covenants binding on successors in interest to New Town, and placed enforcement rights and remedies in the RLA, the District of Columbia, "any successor in interest to the Private Development Property," and the United States. Section 3.3 of Article III specified that the RLA and the United States were deemed the beneficiaries of the agreements and covenants provided for in § 3.1, "both for and in their own right and also for the purpose of protecting the interests of the community and the other parties, public or private, in whose favor or for whose benefit such agreements and covenants have been provided." Section 3.3 further lodged the right to bring judicial enforcement action in the RLA and the United States.[5] Section 3.4 stated that "[e]xcept as otherwise expressly provided in this Agreement (including but not limited to, provisions in favor of the United States in Section 3.3), no person other than a party to the Agreement or a successor or assign, shall have any right to enforce the terms of the Agreement against a party, its successors or assigns."

Article VII concerned "Equal Employment Opportunit[ies], Social and Economic Programs," and contained prohibitions on discrimination (§ 7.2), as well as a requirement that the Redeveloper "provide opportunities for minority firms as contractors, subcontractors and suppliers" (§§ 7.4 and 7.5). Section 7.5(b) called for the "creation of a real estate company, 25% of whose ownership would rest in a non-profit corporation";[6] and § 7.5(c) imposed obli-

---

ment Property had been transferred from the federal Department of Housing and Urban Development ("HUD") to the RLA on June 5, 1975.

**3.** Section 310.02, Urban Renewal Plan.

**4.** Section 310.04(a) through (e), Urban Renewal Plan.

**5.** Section 3.3 of the LDA stated, in part:

The Agency, in the event of any breach of any such agreement or covenant, and the United States, in the event of any breach of any agreement or covenant provided in subsections 3.1(b) [prohibition on discrimination on the basis of race, color, religion, sex or national origin in the sale, lease, rental, use or occupancy of the Private Develop-

ment Property], and 3.1(c) [requiring that all advertising of sales or rental indicate that the Private Development Property is "An Open Occupancy Building"], shall have the right to exercise all of the rights and remedies, and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breach of agreement or covenant, to which it or any other beneficiary of such agreement or covenant may be entitled.

**6.** The relevant parts of § 7.5(b) mandated that:

Within 3 months after the date of this Agreement, the Redeveloper will create or cause the creation of a new real estate sales and management company (the "Real Es-

gations on the Redeveloper relating to investment in the Town Center.[7] Section 7.8 pertained to "Community Organization," and subsection (a) required the Redeveloper within three months of the execution of the LDA to create a non-profit corporation "which will attempt to secure funds from foundations and from governmental entities and to perform selected community services for the Project during the period of the Plan...."[8] Section 7.7 obligated the Redeveloper to "provide [an] opportunity for investment by members of the District of Columbia community, particularly minority group members, in the Redeveloper," in part, by "mak[ing] available for purchase by members of the local community such number of shares ... as shall constitute 15% of the authorized common stock of the Redeveloper immediately after the issuance thereof...."

At the time the LDA was executed, New Town was owned and operated by Theo-

dore R. Hagans, an African American businessman. New Town was incorporated by Mr. Hagans on March 17, 1975, to develop the Fort Lincoln Urban Renewal Area. The Realty Corp. was incorporated by Mr. Hagans on August 18, 1975, to manage the sale, rental, management, and maintenance of improvements owned and held for sale or lease by New Town. Mr. Hagans died in a plane crash, in 1984. Appellee, Michele Hagans, is the daughter of Mr. Hagans and has been the President and Treasurer of New Town and the Realty Corp. since April 1984. Appellee, Barbara Jones, inherited 33.33% of the stock in New Town and the same amount of the stock in the Realty Corp. Prior to the end of the probate of Mr. Hagans' estate, Ms. Jones sold her prospective right to the stock of the Realty Corp. to Ms. Hagans. Hence, majority control of New Town and the Realty Corporation always has been in the hands of minority investors.

On August 8, 2002, the Civic Association and Ms. Faison,[9] filed a complaint against

tate Company") with which the Redeveloper shall contract for the sales, rental, management and maintenance (except to the extent such maintenance is handled by GSA) of all Private Improvements owned or held for sale or lease by the Redeveloper.... The Real Estate Company may be owned by the Redeveloper or shareholders of the Redeveloper subject to the following:

(i) At the time of creation of the Real Estate Company at least 25% of the ownership of the Real Estate Company shall be vested in the Non–Profit Corporation described in Section 7.8 or held by the Redeveloper in trust for the Non–Profit Corporation pending its creation.

7. Section 7.5(c) stated, in pertinent part:
The Redeveloper shall afford minority group members equal opportunity to invest in Private Improvements in the Town Center by providing an opportunity to minority group members to acquire at least 25% of the ownership interest in the free standing retail and personal service shopping space in the Town Center (consisting of approximately 50,000 square feet).

8. Section 1(y) of the LDA provided that:
" 'Project' shall have the meaning set forth in

Recital 3 hereof." Recital 3, the third "whereas" clause of the LDA, referred to the entire "urban renewal project known as the Fort Lincoln Urban Renewal Area" as "the 'Project.' " Section 7.8(b) stated:

The Redeveloper has commissioned a study of the alternative methods of ownership and operation of the physical infrastructure of the Project, including community facilities within the Project Property [defined in § 1(z) as "both the Private Development Property and the property to be owned by governmental agencies"] which are not to be owned and operated by the government of the District of Columbia. Based upon the results of this study, the Redeveloper shall consider the possibility of establishing a homeowners' association or community corporation (The "Homeowners' Association") for the purpose of owning and operating such facilities and shall determine the manner of funding the activities of such a Homeowners' Association.

9. The 2002 Complaint identified the Civic Association as a not-for-profit membership organization. Membership was limited to owners or residents of Fort Lincoln. The Civic

New Town, the Realty Corp., Ms. Hagans, and Ms. Jones for breach of contract, breach of trust, conversion/misappropriation, breach of fiduciary duty/fraud-nondisclosure, and violations of the District of Columbia Consumer Protection Procedures Act ("the CPPA") and the District of Columbia Condominium Act ("the Condominium Act"). In the alternative, the Civic Association pleaded negligence and unjust enrichment, and asked the court to impose a constructive trust. On March 13, 2003, Lillie Mae Griffin, Carol Hood–Mainor, and Harry D. Morgan[10] filed a class action complaint against appellees alleging the same conduct and identical claims. On August 28, 2003, the trial court consolidated the cases.

In an order dated February 17, 2004, the Honorable Michael L. Rankin granted, in part, defendants' motion to dismiss the consolidated complaint, pursuant to Super. Ct. Civ. Rule 12(b)(6). After hearing oral arguments on the issue and reviewing supplemental briefs filed by the parties regarding the test for determining whether a third-party claimant may enforce a government contract, Judge Rankin concluded that "plaintiffs are incidental beneficiaries of the LDA," and thus, are precluded from enforcing the government contract. In addition, Judge Rankin determined that plaintiffs "are specifically precluded by operation of section 3.4 of the LDA from bringing a contract action to enforce the terms of the LDA." The judge declined, however, to dismiss appellees' non-contract claims, stating that "where a plaintiff alleges a distinct claim, she may proceed on that claim even though another claim arising from the conduct is barred."

Subsequently, following discovery and the filing of dispositive motions, the Honorable Herbert B. Dixon, Jr., in essence, reaffirmed Judge Rankin's dismissal of the plaintiffs' breach of contract claim. In addition, he dismissed the plaintiffs' remaining claims on July 29, 2005, granting the motion of New Town, the Realty Corp., and Ms. Hagans for judgment on the pleadings (treated as a motion for summary judgment), and the motion of Ms. Jones for summary judgment. The judge concluded that "plaintiffs' claims are mere re-characterizations of the previously dismissed breach of contract claim, and that plaintiffs lack standing to pursue the remaining common law and statutory claims alleged in the complaint." Judge Dixon explained that "Judge Rankin did not rule on the issue of whether plaintiffs' non-contract claims were simply a re-characterization of plaintiffs' breach of contract allegations." The judge found that "plaintiffs have failed to demonstrate that their multiple claims are independent of the dismissed breach of contract claim." In addition, Judge Dixon determined that plaintiffs did not offer sufficient evidence to support their statutory claims and failed to establish that defendants owed them any duties outside of the contract.

## ANALYSIS

### The Contract Claims

Appellants primarily contend, in essence, that the trial court improperly dismissed their breach of contract claim since they are intended third party beneficiaries who have the right to enforce the terms of the LDA. They claim intended beneficiary status because they are "residents of

---

Association's Executive Board included the presidents of five condominium associations and five rental associations. Ms. Faison has been a condo owner since 1976.

10. According to the 2003 Complaint, Ms. Griffin has been a condominium owner since 1976 and Ms. Hood–Mainor since 1978. Mr. Morgan was a condominium owner between 1976 and 1988.

Fort Lincoln" (and minority residents), and because "the express provisions in Article VII [of the LDA] evince a clear intent by the parties to benefit plaintiffs and other residents of Fort Lincoln." They maintain that appellees failed to implement several provisions of the LDA designed to benefit them. They assert, for example, that New Town (a) "failed to offer members of the local minority community the opportunity to purchase 15 percent of the common stock of New Town [ ], in violation of Section 7.7(a) [of the LDA]"; (b) "failed to create a Non–Profit Corporation which would perform community services for the Fort Lincoln area during the redevelopment project, in violation of Section 7.8(a) [of the LDA]"; and (c) "failed to 'provide an opportunity to minority group members to acquire at least 25% of the ownership interest in the free standing retail and personal service shopping space in the Town Center,' in violation of Section 7.5(c) [of the LDA]." Furthermore, they argue that § 3.4 of the LDA is limited to the provisions of Article III, and is not applicable to Article VII. Appellants assert that "[t]he circumstances surrounding the formation of the LDA further demonstrate that [they] are intended beneficiaries of the contract." They point to a statement by Mr. Hagans, "the soon-to-be President of New Town[ ]," indicating that "[a]ll members of the Board of [New Town] have a copy of the [LDA]," and that they were "familiar with the provisions of the document, particularly Article VII, which relates to the responsibility of the developer to provide opportunities for the minority community to benefit from the development of Fort Lincoln." They also cite a statement by the then executive director of the RLA concerning the creation of "a non-profit Community Corporation" which would be "controlled … by Fort Lincoln residents," within two years of the completion of the Project.

Appellees argue that "[t]he express language" of § 3.4 of the LDA does not grant to a third party "the right to bring suit to enforce any of the terms of the LDA[,]" a "government contract." They insist that "[a]ny rights or benefits conferred upon [appellants] in the LDA do not include the right to sue to enforce any of the terms of the LDA." Moreover, they maintain, "the LDA lacks any legislative history, or any appellate construction that can be read as conferring upon [appellants] any right to enforce the terms of the LDA." Contrary to appellants' argument, appellees contend that § 3.4 is not limited to the Article III provisions of the LDA because "Section 3.4 expressly applies to the Agreement and not to some subsections of the Agreement." Furthermore, appellees assert that appellants are only "incidental beneficiaries" of the LDA.

We review denials of motions for judgment as a matter of law *de novo*. *See Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 945 (D.C.2003). "Judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the opposing party, there is 'no legally sufficient evidentiary basis for a reasonable jury to find' for the non-moving party." *Id.* (citing *Railan v. Katyal*, 766 A.2d 998, 1006 (D.C.2001) (quoting Super. Ct. Civ. R. 50)). "In our review, we 'must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting [our] judgment for that of the [trial court] or jury.'" *Id.* (citing *Alliegro v. ACandS Inc.*, 691 A.2d 102, 105 (D.C. 1997) (citations and internal quotation marks omitted)). "A plaintiff cannot 'stave off the entry of summary judgment' through '[m]ere conclusory allegations.'" *Maupin v. Haylock*, 931 A.2d 1039, 1042 (D.C.2007) (quoting *Musa v. Continental Ins. Co.*, 644 A.2d 999, 1002 (D.C.1994) (other citation omitted)). Furthermore,

"[t]he moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the burden shifts to the non-moving party to designate specific facts showing that there is a genuine issue for trial." *La-Prade v. Rosinsky*, 882 A.2d 192, 196 (D.C. 2005) (citations omitted). To carry this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (citation and internal quotation marks omitted).

 "Since the proper interpretation of a contract is a legal question, 'this court exercises *de novo* review.'" *Unfoldment, Inc. v. District of Columbia Contract Appeals Bd.*, 909 A.2d 204, 209 (D.C.2006) (quoting *Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 867 (D.C.2005)). "In construing a contract, the court must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.* (citation and internal quotation marks omitted). "'Where the language in question is unambiguous, its interpretation is a question of law for the court.'" *Id.* "'A court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract ... and will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity'" *Id.* (citation omitted).

 We now discuss whether appellants are intended third-party beneficiaries (of the promises made by the Redeveloper in the LDA) who have the right to enforce the provisions of the Agreement by asserting a breach of contract claim against appellees. Generally, a stranger to a contract may not bring a claim on the contract. *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at least show that it was intended for his direct benefit."). "[A]n indirect interest in the performance of the undertakings" is insufficient. *Id.* (citations and internal quotation marks omitted). "In order to sue for damages on a contract claim, a plaintiff must have either direct privity or third party beneficiary status." *Alpine County, California v. United States*, 417 F.3d 1366, 1368 (Fed.Cir.2005) (citing *Anderson v. United States*, 344 F.3d 1343, 1352 (Fed.Cir.2003)). "Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status." *Id.* THE RESTATEMENT (SECOND) CONTRACTS ("RESTATEMENT") uses "the terms 'intended' beneficiary and 'incidental' beneficiary ... to distinguish beneficiaries who have rights from those who do not." RESTATEMENT, Chapter 14, Introductory Note (1981). Section 302(1) of the RESTATEMENT sets forth the circumstances under which an entity or individual will be recognized as an intended beneficiary:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Thus, "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty." RESTATEMENT, § 304. "An inciden-

tal beneficiary is a person who will be benefited by performance of a promise but who is neither a promisee nor an intended beneficiary." RESTATEMENT, § 315, cmt. (a); *see also* RESTATEMENT, § 315 ("An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee."); RESTATEMENT, § 302(2) ("An incidental beneficiary is a beneficiary who is not an intended beneficiary."). In that regard, "[g]overnment contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." RESTATEMENT, § 313 cmt. (a). As the RESTATEMENT indicates in § 313(2)(a)-(b):

> (2) [A] promisor who contracts with a government or governmental agency to do an act or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless
> (a) the terms of the promise provide for such liability; or
> (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

 We are not persuaded by appellants' arguments that express provisions of Article VII of the LDA substantiate that they, as residents (and minority residents) of Fort Lincoln, are intended beneficiaries of the Agreement, and that statements by Mr. Hagans and the executive director of the RLA during "[t]he circumstances surrounding the formation of the LDA," further support their claim as intended beneficiaries. To the contrary, our review of the LDA and the arguments of the parties pertaining to the LDA, convinces us that appellants have

not sustained their burden to prove that they are intended beneficiaries, *see Ross v. Imperial Constr. Co., Inc.,* 572 F.2d 518, 520 (5th Cir.1978) ("The burden of proving the requisite intent, of course, falls upon the third party."). Read as a whole, the LDA manifests an intent to benefit the District of Columbia and all its residents, including minorities and minority business enterprises. Moreover, our reading of the LDA satisfies us that appellants are incidental beneficiaries rather than intended beneficiaries. We start with the premise, as we said in *Moore v. Gaither,* 767 A.2d 278 (D.C.2001), that "'third party beneficiaries of a Government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract absent clear intent to the contrary.'" *Id.* at 287 (quoting *Beckett v. Air Line Pilots Ass'n,* 301 U.S.App. D.C. 380, 388, 995 F.2d 280, 288 (1993) (emphasis in original) (other citation omitted)).

That "clear intent," *Moore,* 767 A.2d at 287, is not present either in the provisions of the LDA, or in the statements of Mr. Hagans and the executive director of the RLA, which appellants have referenced. The LDA contemplates a range of facilities for the Fort Lincoln community, estimated to consist of 16,000 persons at the time the Agreement was executed. These facilities included community facilities, a commercial Town Center, educational institutions, and housing for low, moderate, and middle income families, and the elderly. The LDA does not single out any particular civic association, nor condominium owners as intended beneficiaries. Nor does it reflect an "express or implied intention to benefit ... appellants directly." *See Alpine County, California,* 417 F.3d at 1368. *See also Chancellor Manor v. United States,* 331 F.3d 891, 901 (Fed.Cir.2003) ("[I]n order to prove third-party beneficiary status, [a]ppellants must demonstrate that the contract not only reflects an ex-

press or implied intention to benefit the party, but that it reflects an intent to benefit the party directly") (citing *Castle v. United States*, 301 F.3d 1328, 1338 (Fed. Cir.2002)). Article VII of the LDA, on which appellants rely to show that they are intended beneficiaries, is designed to ensure equal opportunities for minorities and to preclude discrimination.[11] Appellants' case for intended beneficiary status centers primarily on §§ 7.5(b) and §§ 7.8(a) and (b). Under the introductory paragraph to this section, "[t]he Redeveloper agrees that it will promote, in cooperation with the [RLA], the District of Columbia government, and Federal and other public and private agencies and organizations, to the fullest extent consistent with sound economic development, opportunities for minority owned and operated businesses in the Town Center and Community Malls." Thus, §§ 7.5 is earmarked for minority business enterprises. The Complaints, filed in 2002 and 2003, do not identify any of the plaintiffs as owning a minority business enterprise. Nevertheless, appellants appear to suggest that because § 7.5(b) indicates that "the Redeveloper will create or cause the creation of a new real estate sales and management company" to handle "the sale, rental, management and maintenance . . . of all Private Improvements owned or held for sale or lease by the Redeveloper," they are intended beneficiaries of the LDA, as evidenced also by § 7.5(b)(i) which specifies that "at least 25% of the ownership of the Real Estate Company shall be vested in the Non–Profit Corporation described in [§ ] 7.8 . . . ."

But, nothing in § 7.8(a) pertaining to the creation of a Non–Profit Corporation whose function was to "attempt to secure funds from foundations and from governmental entities and to perform selected community services for the Project," that, is the entire Fort Lincoln Urban Renewal Plan, reflects the parties' intent to make appellants intended beneficiaries with a right to enforce the agreement, as opposed to incidental beneficiaries or members of the community who would derive some benefit from the provisions of the LDA. Similarly, § 7.8(b) which addresses a homeowners' association or community corporation, does not catapult appellants into intended beneficiaries. Section 7.8(b) provides for "a study of the alternative methods of ownership and operation of the physical infrastructure of the [Fort Lincoln urban renewal project], including certain community facilities." The "physical infrastructure" was not limited to housing such as condominiums with which appellants are primarily associated. More importantly, § 7.8(b) did not mandate the creation of a homeowners' association or a community corporation. Rather, § 7.8(b) left it to the Redeveloper's discretion as to whether such an association or corporation should be created: "Based upon the results of this study, the Redeveloper shall consider the possibility of establishing a homeowners' association or community corporation . . . for the purpose of owning and operating such facilities . . . ."

While intent may be "adduced" if it "is not expressly stated in the contract," *see*

---

11. For example, § 7.1(b) concerns "training, employment, business and investment opportunities for minority group members"; § 7.2(a) prohibits discrimination on the basis of "race, color, religion, sex, or national origin"; § 7.3 refers to "opportunities for training and employment of residents of the District of Columbia, particularly minority group residents, in the planning, construction, management, sales or leasing, and maintenance of Private Improvements [constructed within Parcels conveyed to the Redeveloper] to be developed under [the LDA]"; and § 7.4 pertains to "opportunities for minority firms as contractors, subcontractors and suppliers in the construction and development of [private and public improvements]."

*Roedler v. Department of Energy*, 255 F.3d 1347, 1352 (Fed.Cir.2001), we cannot discern such an intent from the statements of Mr. Hagans, and the RLA executive director, referenced by appellants. Mr. Hagans' general statement that members of the New Town Board had a copy of the LDA and were familiar with "Article VII, which relates to·the responsibility of the developer to provide opportunities for the minority community to benefit from the development of Fort Lincoln," hardly shows the intent of New Town and the RLA to make the appellants intended beneficiaries of the LDA, and to benefit them directly. Similarly, the general statement by RLA's executive director about the establishment of "a non-profit Community Corporation" which would be "controlled ... by Fort Lincoln residents," within two years of the completion of the Project, cannot be considered as expression of Mr. Hagans' and RLA's intent to make these appellants, associated with condo unit ownership, intended beneficiaries of the LDA, as opposed to incidental beneficiaries.

In short, we do not read the LDA as conveying a promise by the Redeveloper, specifically earmarked for the Civic Association or the individual appellees here, to perform any specific duty for these particular appellants or residents of Fort Lincoln. *See* RESTATEMENT, § 304. Even though appellants might benefit from some of the promises made by the Redeveloper, those promises would not then make them intended beneficiaries. Rather, appellees are incidental beneficiaries, part of the public and the 16,000 residents of the Fort Lincoln community who might realize some benefit from implementation of the LDA. *See* RESTATEMENT, § 315 cmt. (a). Furthermore, as appellees emphasize, the LDA is a government contract. And, "a promisor who contracts with a ... governmental agency to do an act or render a service to the public is not subject to contractual liability to a member of the public

[or a member of the 16,000 person Fort Lincoln community] for consequential damages resulting from [any] ... failure to perform ..." any promise reflected in the LDA. *See* RESTATEMENT, § 313(2).

Even assuming, *arguendo*, that appellants are intended beneficiaries of the LDA, we cannot say that they have a right to enforce this government contract between a District of Columbia agency, and the Redeveloper, and a contract in which the United States has a clear interest, through HUD and through provisions within the LDA. Appellees highlight Article III of the LDA, especially § 3.3 which not only places the right to bring judicial enforcement action in the RLA and the Redeveloper, but also gives the RLA and the United States the task of "protecting the interests of the community and the other parties, public or private, in whose favor or for whose benefit [ ] agreements and covenants have been provided." They further emphasize § 3.4 which explicitly states that "no person other than a party to the Agreement or a successor or assign, shall have any right to enforce the terms of this Agreement against a party, its successors or assigns." But appellants argue that the Article III provisions are limited to Article III, and do not preclude them from bringing this enforcement action. Article III of the LDA covers "restrictions upon use of property," and therefore it is possible to interpret that Article as pertaining only to agreements and covenants related to or running with the land, and not to the entire LDA. Yet, the trial court concluded that by its plain words, particularly the explicit use of the term "this Agreement," meaning the entire LDA, § 3.4 shows that the contracting parties intended for the Article III enforcement provisions to apply to the entire LDA, and to prohibit the action brought by appellants.

To examine the arguments of the parties regarding the right to enforce the LDA, we turn to case law from the United States Claims Court or the United States Court of Federal Claims, and the United States Court of Appeals for the Federal Circuit. In 1984, the Claims Court articulated a two-part test to determine whether a contract "entitle[d] one to sue as a third-party beneficiary of a contract which he is not a party": "[T]he contract must reflect the intent not merely to benefit the third-party but also to give him the direct right to compensation or to enforce that right against the promisor." *Baudier Marine Elecs., Sales & Serv., Inc. v. United States,* 6 Cl.Ct. 246, 249 (1984) (citations omitted). Ultimately, the *Baudier* test was rejected by *Schuerman v. United States,* 30 Fed.Cl. 420, 428–33 (1994), and replaced by one adopted in *Montana v. United States,* 124 F.3d 1269, 1273 (Fed.Cir.1997). *See Flexfab, LLC v. United States,* 62 Fed.Cl. 139, 147 (2004).[12] Thus, "the appropriate test for intended third-party beneficiary status includes only the first prong of the *Baudier* test, that the contract must 'reflect[ ] the express or implied intention of the parties to benefit the third party.'" *Montana, supra,* 124 F.3d at 1273 (quoting *Schuerman,* 30 Fed. Cl. at 433). *Montana* further declared that "[o]ne way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Id.* at 1273 & n. 7 (citing RESTATEMENT (SECOND) OF CONTRACTS § 302(1)(b) cmt. (d)). Under this refined test concerning intended beneficiary status, our inquiry is whether appellants would be reasonable "in relying on the promise[s] [of the LDA parties] as manifesting an intention to convey a right on

them," specifically, the right to sue to enforce the contract. *Dewakuku v. Martinez,* 271 F.3d 1031, 1042 (Fed.Cir.2001) (citing *U.S. Ecology, Inc. v. United States,* 245 F.3d 1352, 1356 (Fed.Cir.2001); *Montana, supra,* 124 F.3d at 1273).

By focusing on Articles III and X in particular, we examine whether appellants here would be reasonable in relying on the LDA parties' promises as manifesting an intention to confer on appellants the right to sue to enforce the LDA contract. We set forth pertinent provisions of Article III earlier in this opinion, but Article. X governing remedies also is instructive concerning the right to enforce the LDA. Section 10.1(a) generally provides an enforcement process limited to the RLA and the Redeveloper. In the case of a default and a failure to cure, "an aggrieved party may, in addition to exercising any other rights specified in this Agreement, institute such proceedings as may be necessary or desirable in its opinion to cure and remedy such default or breach, including, but not limited to, proceedings to compel specific performance of its obligations by the party in default or breach where not inconsistent with the other provisions of this Agreement." Section 10.4 addresses "defaults by the Redeveloper with respect to this Agreement" and alleged defaults, including those relating to Article VII, §§ 7.5(b) (opportunities for minority business enterprises, and the creation of the Real Estate Company) and 7.8 (creation and funding of the Non–Profit Corporation or the Homeowners' Association). In the event of a failure of the Redeveloper to cure any alleged default in response to a written demand by the RLA, "the Agency at its option may terminate the Agreement," but the Redeveloper may elect to

12. *Schuerman* relied upon § 302 of the RESTATEMENT, and limited the court's third-party beneficiary test to *Baudier's* first prong, the

so-called "intention-to-benefit" test. *Flexfab,* 62 Fed.Cl. at 147 (citing *Schuerman,* [30 Fed. Cl.] at 433).

continue to develop "Parcels previously conveyed to [it]." And, the Agency and the Redeveloper would retain the right "to the benefits of, and to enforce, all rights, obligations, conditions, covenants and other provisions of the Agreement relating to or affecting the development of all Parcels which have been conveyed to the Redeveloper or with respect to which the Redeveloper has made the election to continue...." Although Article X apparently does not include language identical to that appearing in § 3.4 which explicitly states that "no person other than a party to the Agreement ... shall have any right to enforce the terms of the Agreement against a party ...," it contains no provision which suggests, even remotely, that the parties intended any third party to have the right to enforce the LDA. Nor do we see any implicit provision in the LDA which reasonably may be interpreted to reflect an intent on the part of the RLA and the Redeveloper to permit appellants such as those involved here to bring an action to enforce the LDA.

In light of the explicit language of § 3.4 ("no person other than a party to this Agreement, or a successor or assign, shall have any right to enforce the terms of this Agreement against a party, its successors or assigns"), and the lack of any express language in Article X on remedies which grants a third-party a right to file an enforcement action against the contracting parties, we conclude that appellants could not reasonably rely on the LDA as conveying the parties' intent to confer on them the right to file such an action. *See U.S. Ecology, supra,* 245 F.3d at 1357 ("If the federal government [or District government] had intended for the alleged contract to confer a right upon a third party, it could have expressly provided for such a right in the contract documents."); *see also Dewakuku, supra,* 271 F.3d at 1041–42 (explicit language in one section of the contract—"[n]o third party contract rights

conferred—... extinguish[ed] the rights of any third party under the [contract]," precluded an enforcement action by a third-party, despite contention that "when read within the broad context of the [contract], [that section] is anything but clear"). In short, we are persuaded that appellants do not enjoy intended beneficiary status under the LDA, but are properly described as incidental beneficiaries. And, appellants could not reasonably rely on any promise made by the parties to the LDA as conveying on them the right to bring an action to enforce the LDA.

### *Appellants' Other Non-statutory Claims*

We now review the arguments pertaining to appellants' remaining non-statutory claims, which we can deal with summarily. Judge Rankin did not dismiss these claims since discovery had not been completed at the time of his decision. After discovery had been completed, Judge Dixon reviewed the evidence presented by the parties in support of and in opposition to the motions for summary judgment before granting appellees' motions for summary judgment. The trial court determined that (1) "plaintiffs have failed to demonstrate that their multiple claims are independent of the dismissed breach of contract claim"; (2) these claims "simply rely on alleged violations of the LDA, a contract"; (3) "plaintiffs have not established that the defendants owe any duty outside of a contract action based on the LDA"; and (4) "[p]laintiffs' remaining common law ... claims are an impermissible re-characterization of the breach of contract claim."

Appellants contend that the trial court's ruling is incorrect. They argue that they have tort and equitable claims based on "common-law duties, not contractual obligations." Appellees argue that "[w]hile the [non-contract] claims may be based on the same conduct [as the breach of contract claim], the claims must be separate and distinct and supported by facts that

support the separate and distinct claims." But, appellees maintain, "[appellants] [ ] only presented facts that are consistent with an alleged breach of the LDA by [appellees]." Further, they insist, appellants "did not present any evidence of a breach of duty owed to Plaintiffs by Defendants that is separate and distinct from the breach of contract claim that was dismissed by the trial court."

Cases in this court discussing separate claims or causes of action for assault and battery, and for negligence, "do not preclude separate causes of action where the plaintiff has pled and established separate and distinct claims." *District of Columbia v. Chinn*, 839 A.2d 701, 710 (D.C.2003). As we noted in *Chinn*, in a previous case, "we held that the evidence was sufficient to go to the jury on [separate] counts, but we made clear that the two claims were separate and distinct, even though 'related,' and that the two counts were supported by different evidence." *Id.* (citing *District of Columbia v. Tinker*, 691 A.2d 57, 63 n. 5 (D.C.1997)) (discussing *Etheredge v. District of Columbia*, 635 A.2d 908 (D.C.1993)). Where an "appellant has . . . merely recharacterize[d] her assault claim as one grounded in negligence,"[13] however, evidence is not sufficient to go to the jury on separate counts.

■■■ Here, the record shows that appellants' breach of trust (count 2), conversion/misappropriation (count 3), breach of

fiduciary duty/fraud/non-disclosure (count 4), and negligence (alternative count 7) claims all are based on Article VII of the LDA, and specifically §§ 7.5(b) and 7.8, as was their breach of contract claim. In addition, the negligence claim is dependent upon the breach of fiduciary duty claim. Moreover, the exhibits cited as evidence in support of plaintiffs' motion for summary judgment are substantially the same as those supporting the breach of contract claim, and the primary exhibit for all of these counts is Exhibit 1, the LDA. Under these circumstances and applying the principles enunciated in *Chinn, supra,* these non-statutory claims are not "separate and distinct claims" "supported by different evidence," 839 A.2d at 710. Hence, we agree with the trial court that these "claims are an impermissible re-characterization of the breach of contract claim." *See Reaves–Bey, supra* note 13, 840 A.2d at 704.

### Appellants' Statutory Claims

The trial court declared that "as to the statutory claims, plaintiffs have failed to proffer sufficient evidence to support these causes of action," and that their "statutory claims are an impermissible re-characterization of the breach of contract claim." Appellants contend that this ruling is incorrect. They argue that "they have claims as consumers and condominium purchasers under District of Columbia law."[14]

13. *Reaves–Bey v. Karr,* 840 A.2d 701, 704 (D.C.2004).

14. Appellants maintain that:
[New Town] violated the [CPPA] by failing to inform condominium buyers of the existence of the LDA and New Town's [ ] obligations under that Agreement when it offered condominiums for sale. This constituted a failure to state a material fact which tended to mislead. Even if only the parties to the LDA could enforce it, the benefit to Fort Lincoln residents conferred by the LDA was clearly a material

fact for prospective residents. The Realty Corp.[ ] also violated the [CPPA] because it failed to disclose the material provisions of the LDA when it provided management services to the condominium associations and received commissions from condominium sales.
With respect to the Condominium Act, appellants assert that:
New Town's [ ] obligations under the LDA were "unusual and material circumstances" that substantially affected the use or maintenance of the condominiums.

For their CPPA claim, appellants alleged a violation of D.C.Code § 28–3904(e) and (f) (2001), relating to "unfair trade practices." [15] Paragraphs 80 through 82 of Count 5 of appellants' complaint stated, in pertinent part:

80. Since Defendants began selling condominiums in Fort Lincoln and up to the present, defendants have failed to disclose in their Public Offering Statements any of their obligations under Article VII of the Land Disposition Agreement, including, *inter alia,* their obligation to establish and fund the Non–Profit Corporation which would be controlled by, and provide services for, the benefit of Fort Lincoln residents, their obligations to convey 25 percent ownership in defendant Realty Corporation so that the residents would have control over and profit from the sale and lease of properties in Fort Lincoln, and the Non–Profit Corporation's entitlement to a substantial percentage of the gross proceeds from the sale and lease of properties in Fort Lincoln by third parties. Instead, the Public Offering Statements indicated that it was the responsibility of the residents to

form and fund a community or homeowners' organization, if they desired one. Defendants intentionally concealed their obligations under Article VII and intentionally misled the Fort Lincoln residents into believing it was their responsibility to establish and fund a community or homeowners' association.

81. Defendants' obligations under Article VII of the Land Disposition Agreement constitute material information that any prospective owner or tenant would want to know.

82. Defendants misrepresented material facts and failed to state material facts which had a tendency to mislead in violation of the Consumer Protection Procedures Act.

As for the Condominium Act, appellants' complaint alleged a violation of what is now codified as D.C.Code § 42–1904.04(a) (2001).[16] Paragraph 88 of appellants' Complaint (relating to the alleged Condominium Act violation) was identical to Paragraph 80 pertaining to the alleged CPPA violation. Paragraphs 86 and 87 of the Complaint declared that "Defendants'

Therefore, under the Condominium Act, [ ] New Town [ ] was required to inform the purchasers of units in Condominiums 2–5 about the terms of Article VII and to attach a copy of the LDA to the public offering statements for the condominiums it built in Fort Lincoln and offered for sale.

**15.** D.C.Code § 28–3904(e) and (f) (2001) provide:

It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to: ...
(e) misrepresent as to a material fact which has a tendency to mislead;
(f) fail to state a material fact if such failure tends to mislead
. . . .

**16.** D.C.Code § 42–1904.04(a)(7) states, in pertinent part:

(a) A public offering statement shall disclose fully and accurately the characteristics of the condominium and the units therein offered and shall make known to prospective purchasers all unusual and material circumstances or features affecting the condominium. The proposed public offering statement submitted to the Mayor shall be in a form prescribed by his rules and shall include: ...
(7) A copy of any management contract, lease of recreational areas, and any other contract or agreement substantially affecting the use or maintenance of, or access to all or any part of the condominium with a brief narrative statement of the effect of each such agreement upon a purchaser, the condominium unit owners and the condominium, and a statement of the relationship, if any, between the declarant and the managing agent or firm[.]

obligations under Article VII of the [LDA] constitute 'unusual and material circumstances or features' affecting the condominiums at Fort Lincoln"; and that the LDA "is a 'contract or agreement substantially affecting the use or maintenance of the condominiums at Fort Lincoln.'"

■■ Appellees contend that appellants' CPPA claims were properly dismissed because appellants have not alleged that the information that appellees failed to disclose "was considered to be material or misleading to any decision made by any of the Plaintiffs." Yet, paragraph 80 of appellants' CPPA count alleges that appellees "*misled* Fort Lincoln residents into believing that it was their responsibility to establish and fund a community or homeowners' organization" (italics added). Although appellants' pleadings may not have used the word material, the claim that the information that appellees failed to disclose was material is unmistakably the theme of the Supplemental Affidavit of appellant Nora Faison, who states that if she had known about appellees' obligations under the LDA, she "would have tried to get the District of Columbia to enforce these obligations," that she would have felt that she and "all Fort Lincoln residents [ ] had leverage with [appellees] to make improvements in the Fort Lincoln community," such as improvements that Faison sought with respect to duct work in her condominium and improvements that residents have sought to improve security in the community; and that condominium owners could have avoided the expense

they incurred, through their condominium fees, to build a fence around the site of a Civil War-era cannon located in Fort Lincoln to protect it from vandalism, because the Non-Profit Corporation that appellees had a contractual obligation to create and fund—and on whose Board Fort Lincoln residents would have sat—could have been asked to bear that expense.[17]

■■ Appellees argue that appellants' Condominium Act claim was properly dismissed because that Act—specifically, D.C.Code § 42–1904.17—gives the Attorney General of the District of Columbia exclusive authority to prosecute willful violations of the Act. Appellees' argument fails to address D.C.Code §§ 42–1902.09 and –1904.02(d). Section 42–1902.09 states that "[a]ny lack of compliance with this chapter ... shall be grounds for an action or suit to recover damages or injunctive relief, or for any other available remedy maintainable by the unit owners' association, the unit owners' association's executive board, any managing agent on behalf of the unit owners' association, an aggrieved person on his or her own behalf, or, in an otherwise proper case, as a class action." Section 1904.02(d) states in pertinent part that "[a] declarant [offering a condominium unit for sale] shall be liable under this chapter for any false or misleading statement in a public offering statement or for any omission of a material fact with respect to the portion of the public offering statement that he or she prepared or caused to be prepared."[18]

---

**17.** Faison's affidavit was filed in support of appellants' motion for partial summary judgment rather than in opposition to appellees' (subsequent) motions for summary judgment, but should have been taken into account by the trial judge for purposes of determining whether appellants' allegations were sufficient to withstand summary judgment.

**18.** Section 1904.02(d) provides further that "[i]f a declarant did not prepare or cause to be prepared any part of a public offering statement that he or she delivers, the declarant shall not be liable for any false or misleading statement or any omission of a material fact unless he or she had actual knowledge of the statement or omission or, in the exercise of reasonable care, should have known of the statement or omission."

These provisions clearly provide for a private cause of action by aggrieved condominium owners or owners' associations against persons who have sold condominiums without complying with the Act by providing, in their condominium public offering statements, the information about "all unusual and material circumstances or features affecting the condominium" required by D.C.Code § 42–1904.04(a).[19]

■ Neither §§ 28–3904(e)–(f) or –3905(k)(1) of the CPPA, nor §§ 42–1904.02(d) and –1902.09 of the Condominium Act, state that, to be actionable, an alleged misleading statement or omission must be willful or intentional.[20] In *Caulfield v. Stark*, 893 A.2d 970 (D.C.2006), we observed that "unintentional misrepresentation under the CPPA is still an open question";[21] we did not decide the issue but "assumed ... (without deciding) that unintentional misrepresentation claims are available under the CPPA." *Id.* at 977. In deciding the issue here, we take into account the requirement that we construe and apply the CPPA "liberally to promote its purpose." D.C.Code § 28–3901(c). We also note that, in enacting some paragraphs of § 28–3904 other than paragraphs (e) and (f) with which we are concerned, the Council of the District of Columbia specified that, to violate the statute, the acts described must be done with deceit or with knowledge of the probable adverse impact on the consumer. *See, e.g.,* D.C.Code § 28–3904(r)(1)–(5), and (t). By contrast, § 28–3904(e) and (f) describe simple "misrepresent[ation] as to a material fact which has a tendency to mislead" and "fail[ure] to state a material fact if such failure tends to mislead." In light of the plain language of these sections, the ordinary meaning of the words used, and all of the foregoing considerations, we now hold that a condominium owner or condominium owners' association need not allege or prove intentional misrepresentation or failure to disclose to prevail on a claimed violation of § 28–3904(e) or (f) of the CPPA. *See The Chelsea Condo. Unit Owners Ass'n v. 1815 A St. Condo. Group, LLC,* 468 F.Supp.2d 136, 142 n. 6 (D.D.C.2007) (distinguishing plaintiffs' fraud claims from their CPPA claims).

■ Similarly, under D.C.Code § 42–1904.04(a), consistent with the plain and ordinary meaning of the words used, a plaintiff may merely prove a failure to disclose material information. Once this is done, liability attaches and the plaintiff must prove damages. However, a plaintiff may also state a claim for common law fraud.[22] In *313 Freemason v. Freemason*

---

19. We are aware of no reason why claims under the Condominium Act should be limited to claims about the physical features of a condominium.

20. This is not surprising because State consumer protection statutes were also intended to overcome the pleadings problem associated with common law fraud claims by eliminating the requirement of proving certain elements such as intent to deceive and scienter. *See* Bob Cohen, Annotation, *Right to Private Action Under State Consumer Protection Act— Equitable Relief Available,* 115 A.L.R.5th 709, 726–27 (2004); *see also* STUART M. SPEISER, CHARLES F. KRAUSE & ALFRED W. GANS, 9 American Law of Torts 628–41 (1992).

21. As we recognized in *Caulfield,* "in *Osbourne v. Capital City Mortgage Corp.,* 727 A.2d 322, 326 (D.C.1999), we held that 'the clear and convincing evidence standard applies to claims of intentional misrepresentation under the CPPA,' but we did not address whether the CPPA also embraces claims of unintentional misrepresentation." 893 A.2d at 976; *see also Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs.,* 878 A.2d 1226, 1241 (D.C.2005) (citing *Osbourne* ).

22. "The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance

*Assocs.*, 59 Va. Cir. 407 (Va. Cir. Ct.2002), a Virginia trial court reasoned that Virginia's condominium disclosure statute, Va. Code Ann. § 55–79.90, "may have a basis in fraud," and therefore permitted plaintiff's association to sue officers of the condominium developer as well as the developer itself, since the individuals would be reachable in a suit for a common law tort. 59 Va. Cir. at 410. However, the court also observed that a violation of the statute "*may* take the form of fraudulent, and therefore tortious, conduct," *id.* (italics added), suggesting that § 55–79.90 permits but does not require the plaintiff to allege the elements of common law fraud. Thus, we conclude that a plaintiff condominium owner or owners' association that files a claim relating to the public offering statement under § 42–1904.04(a) may allege either mere failure of the developer to disclose in its public offering statement a material and unusual feature affecting the condominium or an intentional or fraudulent failure to disclose in its public offering statement a material and unusual feature affecting the condominium.[23]

In both the CPPA and Condominium Act counts of their complaint, appellants alleged that appellees are liable for punitive damages because "their conduct was willful, malicious and done in an intentional or reckless disregard for the known rights" of appellants.[24] Complaint, paragraphs 84 and 94. However, in both counts, appellants also alleged simple failure to disclose and misleading statements. In paragraph 2 of their Complaint, appellants alleged that appellees "concealed the existence [their obligations under the LDA] from the residents."[25] Paragraphs 80 and 88 both assert that since appellees began selling condominiums in Fort Lincoln, they

> have failed to disclose in their Public Offering Statements any of the obligations under Article VII of the Land Disposition Agreement, including, *inter alia*, their obligation to establish and fund the Non-profit Corporation which would be controlled by and provide services for the benefit of Fort Lincoln residents, their obligation to convey 25 percent ownership in defendant Realty corporation so that the residents would have control over and profit from the sale and lease of properties in Fort Lincoln, and the Non–Profit Corporation's entitlement to a substantial percentage of the gross proceeds from the sale and lease of properties in Fort Lincoln by third parties. Instead, the Public Offer-

---

upon the representation." *Bennett v. Kiggins*, 377 A.2d 57, 59–60 (D.C.1977).

The Council of the District of Columbia modeled the District's Condominium Act on the Virginia Condominium Act. *See* Council of the District of Columbia, Committee on Housing and Urban Development, Report on Bill 1–179, "Condominium Act of 1976," June 16, 1976, Amended June 18, 1976, at 2. The Council Report states, in part:

> To continue and expand the policy of consumer protection . . . ., [t]he Act: . . .
> —requires a public offering statement for residential condominium offerings giving essential information to prospective purchasers, as well as requiring supplemental information to be made available to the purchaser to ensure full and fair dis-

closure (Sec 404—Public Offering Statement).

*Id.* at 4.

**23.** As appellants note in their Brief, the "Condominium Act only applies to Condominiums 2 through 5 because they were built after March 29, 1977, [and] Condominium 1 was built prior to the effective date" of the Condominium Act.

**24.** In Count IV, appellants also alleged fraudulent non-disclosure.

**25.** *See also* paragraph 50 ("Defendant Redeveloper never even informed the residents about its obligation to form [the Non-profit Corporation] . . . .")

ing Statements indicated that it was the responsibility of the residents to form and fund a community or homeowners' organization, if they desired one.

Complaint, paragraphs 80 and 88.[26] There is no dispute that appellees' public offering statements did not disclose information about the LDA or appellees' obligations under it. Under the CPPA the issue raised for the jury is whether appellees' statements about condominium purchasers' options with respect to a homeowners' organization and appellees' failure to disclose the pertinent provisions of the LDA were actually material and tended to mislead. *See* D.C.Code § 28–3904(e) and (f). Under the Condominium Act, the issue raised for the jury would be whether the omitted information was both an "unusual and material" circumstance or feature affecting the condominium. Thus, even if, in Judge Dixon's words, appellants "failed to proffer sufficient evidence to support" their claims about intentional omissions and intentionally misleading statements, they were entitled to present to a jury their claim that

information about the LDA was unusual and material.[27] Hence, we remand the statutory claims to the trial court for further proceedings.

### The Claims Against Ms. Hagans and Ms. Jones

Appellants contend that the trial court erred in ruling that their unjust enrichment claim against Ms. Hagans and Ms. Jones, in their individual capacities, was barred, either "as a re-characterization of the breach of contract claim and for lack of standing" (Ms. Hagans), or due to the statute of limitations applicable to "claims against the Estate of Theodore T. Hagans, Jr." (Ms. Jones).[28] Appellants alleged that Ms. Hagans and Ms. Jones were unjustly enriched because 25% of the shares of the Realty Corporation were never transferred to the Non–Profit Corporation as required by Article VII of the LDA, and because they retained 100% of the shares of New Town, and Ms. Hagans wrongfully retains "49 percent of the ownership interest in the Realty Corporation

---

**26.** In addition, the Complaint seeks not only punitive damages for allegedly intentional acts by appellees, but also compensatory damages. Complaint, paragraphs 3, 99(a).

**27.** Appellees argue that the damages that appellants allege are "speculative at best" because the injuries that appellants allege were proximately caused not by appellees' non-disclosure, but by appellees' alleged failure to satisfy the obligations of the LDA; and because, to avoid the alleged injury, appellants would have had to "put pressure on [appellees] and the District [to] make sure that the terms of the LDA were enforced," an effort whose results may not have been successful even if appellants had been fully informed about the LDA. We leave these issues, and any others relating to damages, to the trial court on remand. We also note that appellee has not raised on this appeal any question about the applicability of the CPPA to this condominium project. *See Owens v. Curtis,* 432 A.2d 737 (D.C.1981); D.C.Code § 29–3901(a)(7) (2001) (as amended).

**28.** D.C.Code § 20–903(a)(1) (2001) specifies:

(a) *Requirement of presentation; time; limitation.*—Except as otherwise expressly provided by statute with respect to claims of the United States and the District of Columbia, (1) all claims against a decedent's estate, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract or other legal basis, shall be barred against the estate, the personal representative, and the heirs and legatees, unless presented within 6 months after the date of the first publication of notice of the appointment of a personal representative....

D.C.Code § 20–1303(b)(1) provides:

(b)(1) *Claims against heirs and legatees.*—Except as otherwise provided in section 20–1302, the right of any person seeking to recover improperly distributed property or its value from any person to whom property has been distributed shall be barred one year from the date of distribution of all the assets of the estate and satisfaction of all known claims against the estate.

that was never transferred to the Non–Profit Corporation as required by the LDA"; therefore, a constructive trust should be imposed on those assets. We agree with the trial court that the discovery rule does not apply to the unjust claim against Ms. Hagans and Ms. Jones, thereby tolling the statute of limitations. As the trial court found, "the notice of appointment of a personal representative of the Estate of [Mr. Hagans Jr.] was published in 1984" and claims against the heirs and legatees of his estate had to be "presented within 6 months after the date of first publication of notice of the appointment of personal representative," under D.C.Code §§ 20–903(a)(1); and pursuant to § 20–1303(b)(1), the right of a person to recover assets improperly distributed to a decedent's heirs "shall be barred one year from the date of distribution of all assets of the estate and satisfaction of all known claims against the estate."

The trial court determined that there had been "notice through public discussion of the LDA"; and the assets of Mr. Hagans' estate were distributed to his heirs in the early 1990s. The court also concluded that Ms. Hagans did not waive the statute of limitations defense. Therefore the applicable statute of limitations barred the unjust enrichment claims against Ms. Hagans and Ms. Jones. The court also "conclude[d] that the [unjust enrichment] claim against [Ms.] Hagans is barred as a re-characterization of the breach of contract claim and for lack of standing...."[29]

 Even assuming, *arguendo*, that the discovery rule applied to appellants' unjust enrichment claim, or that Ms. Hagans waived the statute of limitations' defense, as appellants argue, we agree with

the trial court that the unjust enrichment and related constructive trust counts of appellants' complaint simply re-characterized appellants' breach of contract claim. "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C.2005) (citation omitted); *see also Jordan Keys & Jessamy v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C.2005) ("Unjust enrichment occurs when a person retains a benefit ... which in justice and equity belongs to another."). Here, appellants' theory of unjust enrichment is based on the premise that they are intended beneficiaries of the LDA, and in part on the assumption, as they argued in their motion for partial summary judgment, that "[u]nder the [LDA], Mr. Hagans, as a member of a minority group, should have held a maximum of 51 percent of the shares of the Realty Corp. and the profits from the remaining 49 percent of the shares should have gone to the Non–Profit Corporation" for appellants' benefit. This is essentially the same theory behind part of their breach of contract claim.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court, in part, but remand the statutory claims to the trial court for further proceedings.

*So ordered.*

---

29. Ms. Jones maintained during summary judgment that although she had a right to receive shares of the Realty Corp., she in fact never owned any such shares because she sold her right to them as an heir to Ms. Hagans. She also asserted that she never received any dividends, enrichment or benefits from her ownership of shares in New Town.