*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CV-0612

LADONNA MAY, *et al*, APPELLANTS,

v.

RIVER EAST AT GRANDVIEW, *et al.*, APPELLEES.

Appeal from the Superior Court of the
District of Columbia
(2021-CA-000266-B)

(Hon. José M. López, Motions Judge)

(Argued June 14, 2023                    Decided September 12, 2024)

*Je Yon Jung*, with whom *LaRuby May* was on the brief, for appellants LaDonna May, Ade Adenariwo, Britney Bennett, Theresa Brooks, Davina Callahan, Denine Edmonds, Ciera Johnson, and Robin McKinney.

*Robert L. Ferguson, Jr.*, with whom *Timothy J. Dygert, Jr.*, was on the brief, for appellee River East at Grandview Condominium Unit Owners' Association, Inc.

*Carl J. Schifferle*, Deputy Solicitor General, with whom *Karl A. Racine*, Attorney General for the District of Columbia (at the time of argument), *Caroline S. Van Zile*, Solicitor General, and *Ashwin P. Phatak*, Principal Deputy Solicitor General were on the brief, for appellee District of Columbia.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and MCLEESE *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellants are nine Black, female, low-to moderate-income first-time homebuyers who each purchased condominium units at the RiverEast at Grandview Condominium complex ("Grandview") through the District of Columbia's Housing Purchase Assistance Program ("HPAP"). 14 D.C. Reg. 2500 (1987). Grandview was developed by Stanton View Development, LLC, and its assignee RiverEast at Anacostia, LLC with the assistance of a loan provided by the District of Columbia Department of Housing and Community Development ("DHCD") through its Housing Protection Trust Fund ("HPTF"). Shortly after acquiring their units, appellants attempted to address issues concerning the habitability of their units, including problems with the foundation, sewage, and mold. When these attempts were unsuccessful, appellants collectively filed a thirteen-count lawsuit against Stanton View, RiverEast, DHCD, and the RiverEast at Grandview Condominium Owner's Association ("Association"). Since that time, appellants have been required to evacuate their units and the developers—Stanton View and RiverEast—have filed for bankruptcy. The trial court granted the District's and Association's motions to dismiss appellants' complaint for failure to state a claim against them, which appellants now appeal. We reverse and remand the trial court's dismissal of appellants' claim under the District of Columbia Consumer Protection Procedures Act, D.C. Law 1-76; D.C. Code §§ 28-3901-3913) ("CPPA"). We affirm the trial court's dismissal of appellants' claims of District of

Columbia Human Rights Act ("DCHRA") violations, breach of contract, intentional infliction of emotional distress, and negligence, as well as the trial court's denial of appellants' request to amend their complaint.

## I.    Factual and Procedural Background

We accept the following facts, alleged in appellants' complaint, as true for the purposes of this appeal, as is required when reviewing a trial court's grant of a motion to dismiss. *See, e.g., Creative Consolidation, LLC v. Erie Ins. Exch., LLC*, 311 A.3d 902, 905 (D.C. 2024). DHCD is a District agency with a mission to generate and maintain affordable housing opportunities in order "to revitalize underserved communities in the District of Columbia." The HPTF was created as a vehicle for DHCD to administer funds "to provide assistance in housing production for targeted populations," including through loans to housing developers. D.C. Code § 42-2802. DHCD also manages HPAP, which offers interest-free loans and closing cost assistance to low- and moderate-income homebuyers. In a 2014 loan agreement, RiverEast, an assignee of Stanton View, received $6,310,788 from DHCD to construct affordable housing units at the Grandview complex on Talbert Street in Southeast D.C. in Ward 8 after winning a District bid. The condominiums

were initially intended as rental units, but were later modified to be for purchase.[1] Under the agreement, the housing units were required to be sold to HPTF-eligible homebuyers at approved prices. The agreement, as amended in 2017, specified that the developers were responsible for repaying $1,890,626 of the loan and that the homebuyers, collectively, would be assigned the $4,420,162 of remaining debt with a fifteen-year payment term and zero percent interest. Each year of the fifteen-year term, DHCD would forgive one-fifteenth of each homebuyer's loan, effectively meaning that a homebuyer who abided by the terms of the agreement for the fifteen-year period would not pay any of the principal amount. On March 24, 2017, the Association was incorporated and its bylaws adopted.

Between July and December 2017, appellants purchased their condominium units from the developers through HPAP. Pursuant to the loan agreement between the developers and DHCD, each appellant assumed a proportionate share of DHCD's HPTF loan to the developers and executed a "Deed of Trust Note," secured by a "Second Deed of Trust." The Deed of Trust Note provided that any outstanding portion of the loan would become due and payable if the homebuyer moved out of the unit or failed to keep the unit in good condition, among other scenarios.

---

[1] As appellants point out, there is no evidence in the record at this stage to explain why the contract was amended to convert the referenced units to units for purchase rather than for rent.

Within weeks of moving into their purchased units, appellants began to experience serious issues with the property. As detailed in their complaint, these issues included, but were not limited to, "large wall and ceiling openings, windows no longer closing completely and separation of bathtub and floor throughout unit," "several interior gaps and openings on the walls . . . [that] were not standard hairline cracks," windows that would not close properly, "slanting" floors, mold, a sewage odor, foundational cracks, leaks and resulting water damage to cabinets and carpets, a gap around the edges of the front door, a rotted interior step, electrical issues, and water damage to the home and front door from inadequate rainwater diversion systems.

As early as September 2017, appellants repeatedly notified the developers of the issues, and the developers sent representatives to survey the issues and complete repairs. But the repairs did not resolve issues like the wall openings, water damage, or separation of flooring, and the structural issues continued to worsen. When one appellant, LaDonna May, paid a third-party company to inspect her unit and diagnose the structural problems, the company recommended a fuller assessment of the building's foundation. Ms. May reached out to DHCD to alert it to the structural concerns at the property and ask for its assistance. At DHCD's suggestion, Ms. May filed a formal structural defect warranty claim on March 31, 2019. In October 2019, an inspector with the District of Columbia Office of Regulatory Affairs ("DCRA")

whom Ms. May had contacted visited her unit and issued her a $6,225 fine for failing to keep the unit in good condition, which Ms. May contested. That same month, two more appellants contacted the District of Columbia Office of the Attorney General ("OAG") describing persistent issues of mold and wall cracking. The OAG conducted an investigation and decided not to pursue an enforcement action but encouraged appellants in July 2020 "to consider a private lawsuit under the CPPA."

Appellants filed a complaint against the developers, DHCD, and the Association on January 29, 2021. Developers Stanton and RiverEast subsequently declared bankruptcy, and the claims against them were severed from the claims against DHCD and the Association. Accordingly, litigation proceeded on four counts against DHCD and another against the Association for a total of five counts: (1) unfair and deceptive trade practices by DHCD as a liable entity under the CPAA, (2) violations by DHCD of the DCHRA, (3) DHCD's breach of contract with the developers for failing to enforce a structural defect warranty provision, 4) intentional infliction of emotional distress by DHCD, and 5) negligence by the Association by failing to identify the structural defects in the units.

In March 2021, DHCD and the Association filed separate motions to dismiss appellants' claims. On August 19, 2021, the trial court entered an Omnibus Order granting DHCD's motion and dismissing the claims against the District. The trial

court found that DHCD, as a District agency "subordinate to the Mayor," is non sui juris and thus incapable of being sued. The trial court also found that, even if the District were named in place of DHCD, appellants failed to state a CPPA claim because the District could not be considered a "merchant" under the statute. On appellants' other claims, the trial court concluded that the DCHRA allegations were not contemplated under the statute; appellants were not third-party beneficiaries able to allege breach of the DHCD developers contract; and the alleged conduct did not rise to the level of "utterly intolerable" to substantiate an intentional-infliction-of-emotional-distress claim, nor was the Mayor's office properly notified. On August 26, 2021, the trial court granted the Association's motion, finding that appellants failed to allege any breach by the Association of its duty of care. Appellants timely appealed the trial court's orders granting both motions to dismiss.

## II.    Discussion

We review a motion to dismiss for failure to state a claim de novo. *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 371 (D.C. 2015). We construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015). "To survive a motion to dismiss, '[t]he complaint need only contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face.'" *Atkinson v. District of Columbia*, 281 A.3d 568, 570 (D.C. 2022) (quoting *Scott v. FedChoice Fed. Credit Union*, 274 A.3d 318, 322 (D.C. 2022)) (alteration in original). This is a low standard and does not require a likelihood that the plaintiff will ultimately prevail on the merits. *See Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016).

As a preliminary matter, we note that the trial court found named defendant DHCD to be non sui juris as an agency subordinate to the Mayor. *Cf. Simmons v. D.C. Armory Bd.*, 656 A.2d 1155, 1157 (D.C. 1995). Though the trial court declined appellants' request to substitute the District as the proper defendant, it analyzed the merits of appellants' claims as if the District were named and reasoned that appellants "failed to state a claim for which they could recover from the District." Like the trial court and the parties in their briefing, we address appellants' claims as being against the District.

### A. Violation of the CPPA by the District

In their complaint, appellants allege that the District engaged in "unfair and deceptive trade practices" proscribed by the CPPA when DHCD "funded, promoted, and facilitated the substandard construction of Grand View Condominiums." In granting the District's motion to dismiss, the trial court concluded that appellants failed to state a claim under the CPPA. Citing to *Snowder v. District of Columbia*,

949 A.2d 590 (D.C. 2008), the trial court concluded that the District cannot be a merchant for purposes of the CPPA and found, in any case, that appellants failed to allege that they had engaged in a merchant-consumer relationship with the District. On appeal, appellants argue that the trial court erred in understanding *Snowder* as categorically excluding the District from coverage under the CPPA as a merchant. Appellants subsequently argue that their complaint sufficiently establishes that the District engaged in an unfair trade practice as a merchant by making the affordable housing units available to them. The District raises three arguments in opposition. First, the CPPA does not apply to the District under this court's precedent and recent legislation. Second, the complaint fails to allege that the District engaged in an unfair or deceptive trade practice under the CPPA. And third, appellants failed to provide proper notice of their claim to the District under D.C. Code § 12-309, which requires notice of unliquidated damage claims to be served on the District in writing within six months after the injury was sustained.

### 1. The District as a Merchant Under the CPPA

We first consider the District's argument that it can never be considered a merchant under the CPPA, except for claims relating to the District of Columbia Housing Authority's ("DCHA") activities as a landlord. *See* D.C. Code § 28-3901(e) (referencing the DCHA). The District points to our conclusions in

*Snowder* that the District "is not a merchant for purposes of the CPPA" and "the District is not a commercial enterprise" to support its argument that the District cannot be held liable under the CPPA. *Snowder*, 949 A.2d at 599-600. However, the District removes these conclusions from the broader context of our *Snowder* analysis. Our decision in *Snowder*, which analyzed whether car owners seeking damages for towing fees had CPPA standing to sue the District, turned on whether the District provided services in a manner that established a consumer-merchant relationship between it and the aggrieved party. For that reason, we evaluated whether the District "suppl[ied] the towing and storage services[,]" "receive[d] any remuneration from those companies for the . . . services provided, or enter[ed] into a consumer-merchant relationship . . . ." *Id.* at 600. If we had held in *Snowder* that the District was categorically exempt from liability under the CPPA, there would have been no need to analyze the characteristics of the District's role in municipal towing services. Instead, the analysis in *Snowder* reveals that the District was not liable under a specific set of facts. This was not a categorical exemption from the CPPA.

Additionally, our decision in *Snowder* (and the cases cited therein) relied on a prior version of the CPPA in which nonprofit entities were excluded from liability under the CPPA. *See Id.* at 599-600 (discussing D.C. Code § 28-3901(3) (2001)). The definition of "merchant" was subsequently amended to extend liability to

nonprofit entities. Nonprofit Organizations Oversight Improvement Amendment Act of 2007, D.C. Act 17-33, 54 D.C. Reg. 4085 (July 6, 2007) (revising D.C. Code § 28-3901(a)(3) to read that a "'merchant' means a person, whether organized or operating for a profit or for a nonprofit purpose . . ."). This post-*Snowder* amendment to the CPPA's definition of "merchant" further supports our conclusion that the District is not categorically exempt from CPPA liability and undermines our confidence in the continued weight we should accord *Snowder*'s analysis.

The District also argues that recent emergency legislation passed by the Council of the District of Columbia ("Council") underscores the District's exemption from liability under the CPPA. The Housing Authority Accountability Emergency Amendment Act of 2022 ("Emergency Amendment Act") clarifies that the CPPA applies to the DCHA's landlord-tenant activities and states that "this subsection shall not be construed to otherwise apply this chapter to the District of Columbia or any agency thereof." D.C. Act 24-629, 69 D.C. Reg. 14026 (Nov. 11, 2022) (adding new subsection D.C. Code § 28-3901(e)). The District interprets Section 28-3901(e) as precluding it from CPPA liability, but that interpretation is at odds with the plain language of the subsection. *See, e.g., Dobyns v. United States*, 30 A.3d 155, 161 (D.C. 2011) (looking to the ordinary meaning of a statutory term when the meaning is clear). Instead, the subsection that the Emergency Amendment Act added to the CPPA states first that DCHA is liable under the statute as a landlord

and then that the subsection, rather than the CPPA more generally, does not apply the CPPA to the District or its agencies. In other words, the subsection simply leaves the rest of the CPPA as it was on the question of the District's possible liability. The resolution that the D.C. Council passed in conjunction with the Emergency Amendment Act lends further support to our reading of the statute. Housing Authority Accountability Emergency Declaration Resolution of 2022, Res. 24-650, 69 D.C. Reg. 13451 (Nov. 4, 2022). Pointing to serious deficiencies at DCHA, including a failure to provide habitable housing for residents, the resolution states that amendments to the CPPA clarifying the statute's applicability to landlord-tenant relations "logically include[] one of the District's largest landlords that serves some of its most vulnerable residents: DCHA." *Id.* at 2. The resolution's framing underscores that the Emergency Act was intended to confirm the applicability of the CPPA to DCHA rather than to immunize the District more broadly from liability.

The legislative history and broader context of the CPPA also undermine the District's argument that it cannot be liable under the statute. The Emergency Amendment Act most recently amended the CPPA and appears to be the only amendment addressing the liability of any District agency or related entity under the statute. Across the Council's various acts amending the CPPA since its initial passage in 1976, the Council could have revised the definition of "merchant" to expressly exclude the District if it sought to limit the District's liability to such a

significant degree. However, it did not—the Council only sought, in its most recent amendment to the CPPA, "to *confirm* the applicability of landlord-tenant consumer protections to the District of Columbia Housing Authority."[2] Emergency Amendment Act (emphasis added). Likewise, absent express legislative intent suggesting that the District's exclusion from the CPPA was intended, we think adopting such a reading would produce a result inconsistent with the CPPA's directive that it be "construed and applied liberally to promote its purpose[s]," D.C. Code § 28-3901(c), of remedying improper trade practices, promoting fair business practices, and educating consumers. D.C. Code § 28-3901(b)*; see Odumn v. United States*, 227 A.3d 1099, 1102 (D.C. 2020) (we may look beyond plain meaning where not doing so would produce "absurd results"). For example, the District represented at oral argument that it believes it would not be liable under the CPPA if, through its health agency, it directly sold defective KN95 masks to District residents. We see no evidence in the legislative history of the CPPA of the Council's intent to exclude the District's liability under the CPPA in a circumstance where it is directly acting as a merchant, such as selling defective masks. Therefore, we hold that the District

---

[2] We acknowledge, as the District emphasizes, that while the DCHA is a District agency, it is independently sui juris. D.C. Code § 6-202(a).

may be held liable for its conduct when it acts as a merchant and engages in unfair and deceptive trade practices as defined by the CPPA.[3]

We also agree with appellants that the District acted as a merchant here. Under the CPPA, a "merchant":

> means a person, whether organized or operating for profit or for a nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice[.]

D.C. Code § 28-3901(a)(3). A merchant "is not limited to the actual seller of the goods or services complained of, he must be a 'person' connected with the 'supply' side of a consumer transaction." *Snowder*, 949 A.2d at 599 (quoting *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981)). The District contends

---

[3] We note that, in some circumstances, the District is precluded from suit on sovereign immunity grounds. *See, e.g.*, *Powell v. District of Columbia*, 602 A.2d 1123, 1126 (D.C. 1992). The sovereign immunity defense, however, is not jurisdictional and can thus be forfeited when raised neither at trial nor on appeal. *See D.C. Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Lab. Comm.*, 997 A.2d 65, 76 (D.C. 2010) (defense of sovereign immunity "may be waived" and "is not jurisdictional in the sense that it must be raised and decided by a court on its motion") (brackets and internal quotation marks omitted). The District has not invoked a sovereign-immunity defense in this case beyond Section 12-309, discussed below, either at trial or in this court, and we therefore do not address whether the District might have had a sovereign-immunity defense here or in future CPPA cases.

that it was not acting as a merchant supplying services but rather as a "conduit of government funds" for a governmental purpose, citing *Board of Regents of Univ. of Wis. Sys. v. Mussallem*, 289 N.W.2d 801, 807 (Wis. 1980) (holding that a state university offering student loans was an "arm of the state" and "certainly not a commercial business" subject to consumer protection laws). But the District's characterization of its role in the units' development is belied by the text of the District's loan agreement with the developers, which labels the District as the "Lender," and states that the loan is for "the Lender approved acquisition, construction and development of forty-six (46) affordable" units,[4] with construction done "*in keeping with Lender approved plans and specifications*" for "Lender approved individuals and households." (emphasis added). The District's role extended far beyond the mere provision of funds to include approving the acquisition plan and specifications for the development and then monitoring the construction, controlling the eligibility of homebuyers, and approving the various stages of development for the units at issue. This is more than sufficient to state a facially plausible claim that the District was a merchant and therefore liable under the CPPA.

---

[4] The 2014 loan agreement was signed by the parties when the units were intended to be rented rather than sold. Although the loan agreement was amended in 2017 to include homebuyer units, the relevant portions of the agreement indicating District involvement in the development of the units were not explicitly amended. We also note that the loan agreement does not elaborate on the details of the District's role to oversee the construction and development of the units.

*See, e.g., Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 104-05 (D.D.C. 2004) (holding that offers to obtain supplies, vendor contracts, and promises to oversee or monitor work amounts to a connection with the supply chain sufficient to establish CPPA liability), *Hall v. S. River Restoration, Inc.*, 270 F. Supp. 3d 117, 123 (D.D.C. 2017) (finding that a bank was liable as a merchant under the CPPA where it conditioned payment on using a certain home repair company and retained the ability to make repair company personnel changes).

### 2. Unfair Trade Practices

Turning to whether the District engaged in unfair or deceptive trade practices as defined in the CPPA, we conclude that appellants' complaint sufficiently identifies the District's trade practices. In their complaint, appellants do not allege violations of specific trade practices set forth in the CPPA; though their failure to do so is not, in and of itself, a barrier to a finding that the complaint sufficiently pleads allegations of unfair and deceptive trade practices. *Velcoff v. MedStar Health, Inc.*, 186 A.3d 823, 827 (D.C. 2018) ("Although the complaint does not cite the specific subsections of the CPPA to which each specific allegation relates, matching allegations of the complaint to corresponding subsections of the CPPA [in this case] is a straightforward task. . . . Moreover, the rules do not explicitly require a civil complaint to cite the specific subsections upon which the plaintiff relies.").

Appellants' complaint instead alleges that the District "awarded and continues to award" funds to the developers, "funded, promoted, and facilitated the substandard construction of Grand View Condominiums," and "failed to ensure compliance with applicable codes and regulations.[5] The complaint also emphasizes the structural issues that later made the units uninhabitable and required appellants' evacuation. To support the complaint's allegations, appellants point to the District's contract with developers stating that the District "approved acquisition, construction and development of [the] forty-six (46) affordable" units, required that construction be undertaken "in keeping with [District] approved plans and specifications," and limited the availability of the units to "[District] approved individuals and households." With the added support of the contract's provisions, we find it a straightforward task to match the allegations in appellants' complaint—that the

---

[5] Appellants reiterated in their reply brief and at oral argument that they "allege the District's unfair trade practice is the provision of substandard consumer real estate goods and services" by "represent[ing] that goods or services ha[d] a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they d[id] not have," D.C. Code § 28-3904(a); "represent[ing] that goods or services [were] of particular standard, quality, grade, style, or model, if in fact they [were] of another," D.C. Code § 28-3904(d); "mak[ing] or enforc[ing] unconscionable terms or provisions of sales or leases," D.C. Code § 28-3904(r); and "violat[ing] any provision of title 16 of the District of Columbia Municipal Regulations," D.C. Code § 28-3904(dd). Even without this clarification, which appellants raised outside of their complaint and after their opening brief, we conclude that the complaint sufficiently identifies CPPA trade practices.

District "funded, promoted, and facilitated the substandard construction" of the units—with the specific trade practices contemplated by the CPPA, namely "represent[ing] that goods or services ha[d] a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they d[id] not have," D.C. Code § 28-3904(a), and "represent[ing] that goods or services [were] of particular standard, quality, grade, style, or model, if in fact they [were] of another," D.C. Code § 28-3904(d).

As to whether the District's trade practices were deceptive, we do not address that factual inquiry, which we leave for further consideration by the trial court on remand. *Ctr. for Inquiry Inc. v. Walmart, Inc.*, 283 A.3d 109, 120 (D.C. 2022) ("Importantly, we have recognized that whether a trade practice is misleading under the CPPA generally is 'a question of fact for the jury and not a question of law for the court.'") (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 445 (D.C. 2013)). As long as appellants' interpretation of the conduct at issue is "*not* facially illogical, implausible, or fanciful, then a court may *not* conclude that it is nondeceptive as a matter of law." *Id.* (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008)) (emphasis in original). We do not find it facially implausible that a reasonable homebuyer, in appellants' place, could believe that a partially District-funded housing development, made available only to District residents deemed eligible by the District through a District-run housing assistance

program, would provide housing that was, at a minimum, habitable.  *See id.* at 120-21 (holding that appellant claims alleging placement of homeopathic products next to FDA-approved ones as an unfair or deceptive trade practice was not facially implausible where a reasonable customer could believe that the products were comparably efficacious).

### 3.  Proper Notice Under D.C. Code § 12-309

Finally, we also disagree with the District's argument that appellants' CPPA claim is barred for failing to give proper notice to the District of their intent to sue under Section 12-309, which requires notice of unliquidated damage claims to be served on the District in writing within six months after the injury was sustained. Though the District did not raise a Section 12-309 defense before the trial court, which thus did not make findings on the issue, we address the argument here for the sake of judicial efficiency should it recur on remand.  We review compliance with the requirements under Section 12-309 de novo.  *Snowder*, 949 A.2d at 600.  First, we note that we are unpersuaded by appellants' argument that the District waived its Section 12-309 defense by not raising it below.  *See D.C. Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Lab. Comm.*, 997 A.2d 65, 76 (D.C. 2010) ("[A] sovereign immunity defense sufficiently partakes of the nature of a jurisdictional bar that it may be raised by the State for the first time on appeal . . . .")

(internal quotation marks omitted). However, relief under the CPPA is not limited to unliquidated damages, which is required in order for Section 12-309 notice requirements to apply. *See, e.g., Mazor v. Farrell*, 186 A.3d 829, 835 (D.C. 2018) (citing *Dist. Cablevision Ltd. v. Bassin*, 828 A.2d 714, 732 (D.C. 2003) to hold that damages for a violation of the CPPA constituted liquidated debt where a cable provider was liable for late fees charged to customers). A debt is "liquidated" if, "at the time it arose [it] was an easily ascertainable sum certain." *Id*. at 832. The equitable relief, repayment, and attorney's fees sought by appellants, all contemplated by the CPPA, D.C. Code § 28-3905(k)(2), are either liquidated damages or "fall outside the ambit of unliquidated damages." *Lindsey v. District of Columbia*, 810 F. Supp. 2d 189, 202-03 (D.D.C. 2011). Given the various types of damages available under the CPPA, Section 12-309 notice is not required for *all* potential CPPA damages. Appellants may or may not have been entitled to different types of damages based on their CPPA claim, and we leave the issue of damages to the trial court for further consideration on remand. To the extent that the relief appellants seek under the CPPA is "outside the reach of Section 12-309" consistent with this opinion, their claim is not barred for a failure to notice the District according to Section 12-309 procedure.

**B. Violation of the DCHRA by the District**

In granting the District's motion to dismiss appellants' DCHRA claim, the trial court concluded that appellants failed to allege that the District engaged in conduct with respect to housing and commercial space that is prohibited under Section 2-1402.21 of the DCHRA. We agree.

Under the DCHRA, it is an unlawful discriminatory practice to, *inter alia*, refuse or fail to initiate a real property transaction, refuse or require different conditions of financing, and otherwise discriminate in any financial transaction involving real property based on an individual's actual or perceived membership in a protected class. D.C. Code § 2-1402.21(a). In relevant part, the protected classes recognized by the D.C. Human Rights Act are "race," "sex," "marital status," "familial status," and "source of income."[6] *Id.*

---

[6] The District contends that appellants failed to plead a claim based on "source of income" and instead bring a claim based on "income status." Construing the complaint in appellants' favor, *Grayson v. AT&T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc), however, we conclude that appellants sufficiently pleaded a claim based on source of income where their income level was tied to their eligibility for the affordable housing opportunity at Grandview. The District is correct, however, that appellants raise their "familial status" (single mothers) theory for the first time on appeal. Notwithstanding the protected-class bases of appellants' DCHRA claim, however, we affirm the trial court's dismissal on the grounds that appellants did not sufficiently allege conduct proscribed by the DCHRA.

Appellants' complaint alleges that the District discriminated against them "on the basis of their race, sex, and/or income status" by funding the units in large part and by "den[ying] them property, services, products, and treatment," "affordable quality housing that was safe and structurally sound," and "timel[y] responses and repairs" as compared to similarly situated white and higher-income male District residents. Unlike appellants' CPPA claims, where their allegations could be mapped onto statutory provisions even where unspecified in the complaint, *see Velcoff*, 186 A.3d at 827, appellants' allegations of discrimination do not fall squarely within any of the DCHRA's provisions. Though appellants' claim could conceivably fall under the DCHRA's prohibition on discrimination "in any financial transaction involving real property, on account of the location of residence," D.C. Code § 2-1402.21(a)(6), for example, the discrimination appellants allege concerns events that took place *after* the financial transaction. Further, the complaint lacks sufficient factual support for its claims of discrimination beyond stating that the District's conduct—funding and overseeing the construction, responding in an untimely manner, and providing affordable housing that was structurally unsound—was discriminatory. Appellants' complaint states that DHCD provided "safer and more structurally sound construction, as well as substantively better and timelier responses and repairs to individuals in other areas of the District that are [] substantially more white, higher income, and with male heads of households." While a claim of intentional

discrimination does not require comparator evidence at the pleading stage, *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 622-23 (D.C. Cir. 2023) (discussing the pleading standard set forth in *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017)), appellants must offer factual allegations that are more than mere conclusions. *Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 99 (D.C. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 545 (D.C. 2011) (quoting *Iqbal*, 556 U.S. at 678-79). Though the reference in appellants' complaint to DHCD's treatment of other areas of the city that are more white, higher income, and with more male heads of households offers comparator evidence, the complaint does not provide facts that carry appellants' statement beyond a vague, conclusory allegation. Because appellants' complaint lacks sufficient factual support for discrimination allegations that can be matched with specific statutory provisions, their DCHRA allegations are not sufficient "enough to raise a right to relief above the speculative level." *Bereston*, 180 A.3d at 99 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## C. Breach of Contract by the District

Appellants also contend that the trial court wrongly dismissed their breach of contract claim against the District. To make out a claim for breach of contract,

appellants "must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). A third-party beneficiary to a contract has standing to bring a contractual claim when "the contracting parties had an express or implied intention to benefit directly the party claiming such status." *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008) (internal quotation omitted). Appellants' breach-of-contract arguments are twofold. First, appellants argue that they have standing to enforce a contract with the District as a direct party or, in the alternative, as a third-party beneficiary to its contract with the developers. Second, appellants contend that the trial court erred in ruling, without engaging in any analysis, that the District breached its contractual obligations when it failed to enforce certifications of occupancy and a warranty against a structural defects security bond and conducted no property inspections. We affirm the trial court's dismissal of appellants' breach-of-contract claim on the basis that appellants' lacked standing under either their direct-party or third-party-beneficiary theory.

As to appellants' argument that they are direct parties to a contract with the District, we see no factual allegation to support the existence of such a contract beyond the statement in appellants' complaint that they "suffered damages as a result of [the District's] breach of its contract with" them. Though we are required to

accept allegations in the complaint as true and construe all facts and inferences in favor of the appellants, *In re Estate of Curseen*, 890 A.2d 191, 193 (D.C. 2006), "that tenet does not extend to 'a legal conclusion couched as a factual allegation[.]'" *Bereston*, 180 A.3d at 99 (quoting *Iqbal*, 556 U.S. at 678). Thus, appellants must do more than assert the fact of a direct contract with the District in order to establish standing as a direct party for their breach of contract claim.

Similarly, appellants' complaint does not sufficiently allege their status as third-party beneficiaries to the contract between the District and the developers. Appellants contend that they were "clearly intended parties to the contractual agreements" between the developers and the District, but our precedent and the contractual language itself suggests otherwise. "[T]hird party beneficiaries of a Government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract absent clear intent to the contrary." *Moore v. Gaither*, 767 A.2d 278, 287 (D.C. 2001) (internal citation omitted). Rather than express a clear intent to the contrary, Section 18 of the Loan Agreement between the District and the developers states explicitly that there are no third-party beneficiaries and that "no other person shall have any right or cause of action on account hereof." Appellants argue, however, that Section 18's language is weakened by the contract's stated intention to benefit them as eligible homebuyers under District programs. But we have rejected the contention that plaintiffs' membership in a class of persons

designed to benefit from a contract "reflects the parties' intent to make appellants intended beneficiaries with a right to enforce the agreement, as opposed to incidental beneficiaries or members of the community who would derive some benefit from the provisions . . . ." *Fort Lincoln*, 944 A.2d at 1066. This limitation on a party's ability to enforce a contract is compounded where the contract language has a provision expressly disclaiming a third-party beneficiary right to sue or otherwise lacks a provision expressly providing for a third-party beneficiary right to sue. *Id.* at 1069. In sum, by stating that they are third-party beneficiaries to the District's contract with the developers, appellants state as fact a legal conclusion that is facially implausible.

### D. IIED by the District

The trial court dismissed appellants' IIED claim against the District both for failing to satisfy the procedural notice requirements under Section 12-309 and for pleading facts insufficient to establish that the District's conduct rose to the level of outrageousness required. Even if appellants were able to establish that they satisfied the procedural notice requirements under Section 12-309, their complaint does not sufficiently plead an IIED claim on the merits.[7] A prima facie IIED claim "must

---

[7] Because we affirm the trial court's dismissal of appellants' IIED claim for insufficiently pleading that the District's conduct was extreme and outrageous, we

show (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 656 (D.C. 2023) (internal quotation marks omitted).

Looking to the record and assuming, as we must, that the facts alleged in appellants' complaint are true for the purposes of this appeal, *see, e.g., Creative Consolidation*, 311 A.3d at 905, appellants suffered emotional distress as they set out to purchase their first homes and were soon faced with the kind of structural issues that made their units uninhabitable. We also recognize that the stress of having purchased homes that were falling apart and posed dangers to their health, for various appellants, was compounded, as the complaint asserts, by their responsibilities as new, single parents and sole breadwinners. Appellants' complaint describes Ms. May having gone into premature labor after moving into her unit and then returning home with a vulnerable infant to a home with clear and worsening structural defects. The complaint further states that Ms. May's emotional distress was further compounded when, after reaching out to the DCRA for help, a DCRA inspector cited her for a failure to address the issues in the unit and required her to pay a $6,225 fine, which she contested. Accepting the allegations as true, as we

---

do not address the parties' arguments as to whether appellants' IIED claim was barred for failing to satisfy the procedural notice requirements under Section 12-309.

must for an appeal of a motion to dismiss, it would be understandable that appellants believed they were unfairly treated and that they have suffered as the supposed beneficiaries of a program and project designed to offer life-changing affordable housing opportunities.

However, notwithstanding the allegations they did plead, appellants here do not plead sufficient facts to establish a necessary element of a prima facie IIED claim—that the District's conduct rose to the requisite level of outrageous and extreme action. "To be 'extreme and outrageous,' conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Robertson v. District of Columbia*, 269 A.3d 1022, 1033 (D.C. 2022) (quoting *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997)). Appellants here point generally to the District's abdication of "its own obligations to rectify and/or enforce the habitability of the Property it 'reserved' as affordable housing units" and, more specifically, to the DCRA's issuance of a fine to Ms. May as evidence of the District's outrageous and extreme conduct. We read appellants' more general assertion to argue that the District acted in an outrageous or extreme manner by *failing* to take action, and we are unable to identify controlling precedent that finds the absence of action to be sufficiently outrageous as to substantiate an IIED claim. Even the citations and fine levied against Ms. May by the DCRA

inspector, which are jarring in the context of her repeated efforts to seek help to address the inhabitability of her home, do not rise to the level of atrociousness that is "utterly intolerable in a civilized community." *Id*.

## E. Negligence by the Association

In their single claim against the Association, appellants alleged that the Association was negligent by failing to commission a transition deficiency study "prior to taking over management of the condominium property" from developers and by belatedly submitting a warranty claim. To successfully plead negligence, appellants must show that "(1) the [Association] owed a duty of care to [them], (2) the [Association] breached that duty, and (3) the breach of duty proximately caused [them] damage. . . ." *Freyberg v. DCO 2400 14th St., LLC*, 304 A.3d 971, 976 (D.C. 2023) (quoting *Murphy v. Schwankhaus*, 924 A.2d 988, 991 (D.C. 2007)). We agree with the trial court that appellants' negligence claim insufficiently pleads that the Association breached a duty owed to them.

The trial court did not address the merits of appellants' argument that the Association breached its duty of care by failing to conduct a transition deficiency study, instead dismissing appellants' claim as limited to the period before the Association had any power or responsibility over the units. Under the DC Condominium Act, a unit owners' association's executive board takes control of the

units—including, among other things, providing for their care, upkeep, and maintenance for repairs, D.C. Code § 42-1903.08(d)—after the "expiration of the period of [developer] control. . . ." D.C. Code § 42-1903.02(b). Here, Grandview's bylaws granted such control to the Association. Pursuant to the Condominium Act, the period of developer control expires either by "the time set by the condominium instruments or after units to which three-fourths of the undivided interests in the common elements appertain have been conveyed, whichever occurs first." D.C. Code § 42-1903.02(a). Appellants contend that the trial court wrongly relied on the Condominium Act because the date that the Association took control over the units remained undetermined, and identifying the data required additional information outside the pleadings. But the exact timing of when the Association assumed control over the units from the developers is not at issue when the language of the complaint, and appellants' briefing, is that the Association "failed to conduct a transition deficiency study or otherwise identify structural defects *prior to taking over management*." (emphasis added). The Condominium Act proscribes tort allegations against a unit owners' association when the developer controls the units. D.C. Code § 42-1903.09(a)(2) (a tort action "in connection with the condition of any portion of the condominium which the declarant[8] or the association has the responsibility to

---

[8] Under the language of the Condominium Act, the "declarant" refers to the developer. D.C. Code § 42-1901.02(11)(C).

maintain, shall be brought against the declaration or the association, *as the case may be*.") (emphasis added). Because the *developers* inherently controlled management of the units prior to the Association taking over management, the Association did not owe appellants any duty of care before taking control, regardless of the date their control began. A negligence claim for failing to conduct a transition deficiency study or otherwise identify structural defects would thus be properly directed towards the developers, not the Association. Further, once the Association assumed control of the units, it commissioned a transition study. Appellants' allegation that the Association breached a duty to them *before* taking control of management is not sufficient to state a negligence claim against it.

Turning to appellants' claim that the Association breached its duty of care by failing to promptly submit a warranty claim for the units, we similarly conclude that the complaint does not allege sufficient facts to plausibly plead that the Association breached its duty of care. The Condominium Act requires that a developer warrant against structural defects for two years "from the date each unit is conveyed to a bona fide purchaser," D.C. Code § 42-1903.16(b), meaning that both any individual homeowner and the units owners' association could submit warranty claims related to structural defects for up to two years after the unit was purchased. That the Association filed a warranty claim within two years of the first unit's conveyance is not disputed; rather, appellants contend that by waiting nearly two years to file a

warranty claim, the Association's "egregious [] substantive delay [] given its knowledge of the structural defects" breached its fiduciary duty, which "implicit[ly]" bears an "obligation to promptly exercise its rights, including submitting a warranty claim. . . ." But the complaint suggests that the Association may have attempted to more promptly submit a warranty claim. In dismissing appellants' warranty-claim argument, the trial court noted that the complaint itself states that the developers hindered the Association's ability to finish filing a structural claim, suggesting that the Association had been making prior efforts to file one. We agree that appellants' allegation that the Association failed to promptly file a warranty claim, weakened by other facts in the complaint, does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Atkinson*, 281 A.3d at 570 (internal quotation marks omitted).

## F. Leave to Amend Complaint

In addition to seeking review of the trial court's dismissal of their claims against the District and the Association, appellants appeal the trial court's denial of their request for leave to amend their complaint. "We review a trial court's ruling on a motion to amend a complaint for abuse of discretion." *Redshift, LLC v. Shaw*, 264 A.3d 1182, 1186 (D.C. 2021) (quoting *Flax v. Schertler*, 935 A.2d 1091, 1105 (D.C. 2007)). There is no dispute that appellants requested leave to amend their

complaint in an opposition to the District's—though not the Association's—motion to dismiss their claims. The extent of appellants' request to amend their complaint, however, was limited to replacing DHCD with the District as a named defendant. Appellants argue on appeal that the trial court erred not only by denying substitution of the District but also by denying them general leave to amend; and in particular, appellants contend that they would have supplemented their IIED claims with evidence of additional injury and notice to the District.

We conclude that the trial court did not abuse its discretion in denying appellants an opportunity to amend their complaint. Beyond requesting the substitution of the District for DHCD, appellants did not actually seek leave to amend their complaint. Neither "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought," *Confederate Mem'l Ass'n v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993) (noting agreement with "several of our sister circuits"), nor a court's failure to grant such leave sua sponte, *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 161 n.18 (D.C. 2000), will compel a remand for leave to amend. As to appellants' request to substitute the District for DHCD, we see no abuse of discretion in the trial court's decision, which was based on a reasoned finding that appellants failed to state a claim against the District, even if the District had been named as a defendant, reasoning that we affirm with the exception of appellants' CPPA claim.

## III.   Conclusion

For the foregoing reasons, we reverse the trial court's determination that the CPPA did not apply to the District and hold that the District acted as a merchant under the statute.  We remand for the trial court to consider whether the District's trade practices were unfair or deceptive.  With respect to appellants' other claims, we affirm.

*So ordered.*